UNITED STATES, Appellee

v.

Demetrice K. BAKER, Staff Sergeant
U.S. Army, Appellant

No. 11-6007

No. ARMY Misc. 20100841

United States Court of Appeals for the Armed Forces

Argued July 6, 2011

Decided August 24, 2011

ERDMANN, J., delivered the opinion of the court, in which
EFFRON, C.J., and STUCKY, J., joined.  BAKER, J., filed a
separate dissenting opinion in which RYAN, J., joined.

Counsel

For Appellant:  Captain Richard M. Gallagher (argued); Colonel
Mark Tellitocci, Lieutenant Colonel Imogene M. Jamison, and
Lieutenant Colonel Peter Kageleiry Jr.

For Appellee:  Major Adam S. Kazin (argued); Colonel Michael E.
Mulligan and Major Amber J. Williams.

Military Judge:  Christopher T. Fredrikson

**This opinion is subject to revision before final publication.**

United States v. Baker, No. 11-6007/AR

Judge ERDMANN delivered the opinion of the court.

Specialist Demetrice K. Baker was charged with two specifications of indecent exposure and two specifications of assault in violation of Articles 120 and 128(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920(n), 928(a) (2006). Prior to trial the military judge granted a motion to suppress evidence of an initial photo identification and later in-court identification made by the victim. The Government appealed that ruling to the United States Army Court of Criminal Appeals pursuant to Article 62, UCMJ. The Army court granted the Government's motion to vacate the military judge's ruling. United States v. Baker, No. ARMY Misc. 20100841, 2011 CCA LEXIS 52, at *19, 2011 WL 891345 at *6 (A. Ct. Crim. App. Mar. 7, 2011).

Military Rules of Evidence (M.R.E.) 321(a)(1) and (d)(2), read together with (a)(2)(B), set forth a two-prong test based upon Supreme Court case law for determining admissibility of eyewitness identification. United States v. Rhodes, 42 M.J. 287, 290 (C.A.A.F. 1995). "First, was a pretrial identification unnecessarily suggestive? Second, if the pretrial identification was 'unnecessarily suggestive,' was it conducive to a substantial likelihood of misidentification?" Id. (citations omitted). We granted review to determine whether the military judge abused his discretion in suppressing the victim's

out-of-court and subsequent in-court identifications of Baker as unreliable.[1]  We hold that the military judge did not abuse his discretion in granting the defense motion to suppress and reverse the decision of the Army Court of Criminal Appeals.

### Factual and Procedural Background

The military judge summarized the facts leading up to the identification at issue in his written ruling granting the defense motion to suppress:[2]

> a.  In the afternoon of 25 July 2009, [KTB] went for a fast-paced walk on a bicycle trail near Reinheim, Germany.  [KTB] was walking for exercise/cardiovascular purposes and breathes hard during her walks.  She is normally not focused on the people around her as she walks.  [KTB] is nearsighted and was not wearing her prescription contacts at the time of her walk.  Without her contacts, she can see and recognize people at close distances of 2 to 3 meters.  However, her eyesight is degraded at greater distances.

> b.  Prior to getting onto the bicycle trail and still approximately 20 to 30 meters away, she observed

---

[1] We granted review of the following issue:

Whether the Army Court of Criminal Appeals erred (1) in finding that the military judge's suppression of the identification evidence was an abuse of discretion, and (2) in holding that the pretrial identification procedures were reliable under the circumstances where the Army Court made impermissible findings of fact under Article 62 and relied on such findings in overruling the military judge.

United States v. Baker, No. 11-6007 (June 22, 2011) (order granting review).
[2] The Army Court of Criminal Appeals held that the military judge's findings of fact were not clearly erroneous and adopted them as its own.  Baker, 2011 CCA LEXIS 52, at *2, 2011 WL 891345, at *1.

a bicycle rider (the rider) pass by on the trail in front of her. The rider was a black man wearing bicycle clothes, a bicycle helmet, and sunglasses.

c. After [KTB] started walking along the trail, she saw the rider again approximately 20 to 40 meters in front of her. He was kneeling in front of his bike and doing something to his bike. As [KTB] approached to within 7 to 8 meters of the rider, he looked back at her and then got back on his bike and rode away.

d. [KTB] continued to walk along the trail and saw the rider again. This time he was standing with his back towards her as if he was urinating. As she walked past the rider -- approximately 5 to 7 meters away -- he looked back at her. She continued to walk along the trail, and at some point, the rider passed her again.

e. A while later, [KTB] noticed the rider once again standing with his back towards her as if he was urinating. This time however, as she approached, he turned around, and ran towards her with his penis in his hand. He stood approximately 2 feet in front of her face-to-face blocking her way. He had his pants partially down and he was holding his penis. [KTB] was panicked by this frightful situation. Her heart was beating hard, her "stomach was upside down," and she was focused on getting away. As she tried to get around the rider, either to his left or right, he continued to block her way. The rider then grabbed [KTB]'s sweater and said something which she interpreted as "Get undressed." She pushed him away, saying, "Let me go." He let go of her and she quickly walked away.

f. After [KTB] got home, she called the police and reported that she had been sexually assaulted by a bicycle rider on the bicycle trail. She talked to Officer Gress and described the rider as a 1.75 meters tall black man with a muscular body and wearing bicycle attire -- helmet, sunglasses, and bicycle shirt and shorts.

g. Officer Gress called two patrols for assistance, then Officer Gress and his partner drove to the trail and started looking for a bicycle rider fitting the description given by [KTB]. They did not

see anyone on the entire trail that fit the description, but were able to question two groups of people on the trail. One group of people on the trail told them that they had seen a bicycle rider fitting this description and pointed them in the right direction. Officer Gress and his partner called ahead to another patrol that was blocking off that end of the trail. The other patrol stopped the accused on his bicycle. The accused is a black male and he was wearing bicycle attire -- helmet, sunglasses, and bicycle shirt and shorts. Officer Gress and his partner apprehended the accused and took him back to the police station. At the police station, Officer Gress took two photos with a digital camera -- one full body view of the accused and one of the accused's bike helmet and sunglasses. . . .

h. Approximately 1½ hours after her encounter with the rider on the trail, [KTB] received a phone call from Officer Gress informing her that they "found someone that she should take a look at." When she arrived at the police station, Officer Greff [sic] told her that they had taken photos of the suspect and asked her to provide a more specific description of the rider. She provided the same description as she had over the phone with the addition that the rider had a gap in his teeth and that he spoke English. One of the police officers left the room, which [KTB] presumed was for the purpose of verifying the description.

i. Officer Gress then showed [KTB] the full body picture of the accused on the screen of the digital camera. [KTB], who was now wearing her prescription contacts, said that the accused was the rider who had assaulted her. She also mentioned remembering that the rider had a mustache (or stubble on the face). Therefore, Officer Gress zoomed in on the photo to see if they could decipher the mustache and the gap in the teeth. Then Officer Gress showed [KTB] the screen with just the accused's face on it. (At the 20 September motions hearing, [KTB] only clearly recalled seeing this "close-up," which specifically focused on the accused's face, and admitted that her memory was "pretty blurry" in her mind about how the identification process transpired.) Although she had to look at the photo a few seconds because she had only seen the rider with his helmet and sunglasses on

and had never clearly seen his eyes, [KTB] was able to identify the accused as the rider who assaulted her. According to her 20 September 2010 testimony, she noticed the similarities of the nose, ears, chin and upper lip.

j.   At the 20 September motions hearing, [KTB], who was wearing her prescription contacts, identified the accused as the rider who assaulted her.  She was very sure ("100 percent") of her identification because he "just looks like the person because the nose, cheeks, the beard, the . . . muscular body."

(Second ellipsis in original.)

In his ruling granting the motion, the military judge applied the Supreme Court's five-factor test for determining the admissibility of pretrial and in-court identifications set forth in Neil v. Biggers, 409 U.S. 188, 199-200 (1973):  the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation.

The military judge concluded "the manner in which the photo identification was conducted was unnecessarily suggestive and conducive to a substantial likelihood of misidentification." He ruled the photo identification inadmissible and the subsequent in-court identification also inadmissible because it was "significantly impacted by the suggestive close-up photo: the only time in which [KTB] came 'face-to-face' (without

6

helmet/sunglasses) with either the rider or the accused until the motions hearing 14 months later."

Before issuing his written ruling, the military judge notified the parties of his decision to grant the defense motion. Prior to the issuance of the decision, the Government filed a "Motion for Appropriate Relief (Request for Reconsideration)." The military judge issued his written decision and then convened an Article 39(a), UCMJ, session to address the Government's motion to reconsider. The Government also urged the military judge to adopt additional findings of fact. After an extensive argument and discussion, the military judge adopted additional findings of fact from the bench, which included:[3]

> Based on a preponderance of the evidence, the rider looked back at KTB, he saw her face and she saw the rider's face but "that was not a clear view, and she did not have the eyesight to see his face clearly from that distance."

> "[KTB], when she described the rider, she described him with black bicycle shorts and a white bicycle shirt; in addition to him being 1.7 meters tall, muscular, black complexioned, riding a bicycle -- a racing bicycle and wearing a bicycle helmet."

> "[W]hen [KTB] walked approximately 5 to 7 meters away from the bike rider, she saw [his] face. . . . Not clearly, but she did see it."

---

[3] These findings are paraphrased from the record except where quotations are used.

Notwithstanding these additional findings of fact, the military judge denied the Government's motion for reconsideration.

The Army Court of Criminal Appeals held the facts set forth by the military judge were not clearly erroneous and adopted those facts in its opinion. Baker, 2011 CCA LEXIS 52, at *2, 2011 WL 891345, at *1. However, that court held the military judge abused his discretion when he granted the motion to suppress because he "'committed a clear error of judgment in the conclusions [he] reached upon weighing of the relevant factors.'" Id. at *9, 2011 WL 891345, at *3 (alteration in original) (quoting United States v. Ellis, 68 M.J. 341, 344 (C.A.A.F. 2010)). The lower court held the identification was not so unnecessarily suggestive as to create a substantial likelihood of misidentification. Id. In its de novo review of the Biggers factors, the court concluded:

> [KTB had] a concentrated period of at least one to two minutes to view the rider's face. . . . Contrary to the military judge's conclusions, [KTB] had far more than minimal opportunity and capacity to view the rider the five separate times she observed him. Even with degraded eyesight at a distance past two to three meters, she was able on those five instances to confirm it was the same person in each encounter and to provide a relatively detailed description of what the rider was doing at the time she noted his presence on the trail.
>
> . . . . She focused her full attention on [the rider] five times, albeit for varying lengths of time, to include three occasions which involved more than the rider just passing her on his bike.

8

United States v. Baker, No. 11-6007/AR

Id. at *13, 2011 WL 891345, at *4-*5.

As to the other Biggers factors, the Court of Criminal Appeals held that KTB's description of the assailant was accurate and "agree[d] with the military judge's conclusion that [KTB] had an 'extremely high level of certainty in the accuracy of both her photo-identification and in-court identification of the accused.'" Id. at *15, 2011 WL 891345, at *5. The lower court also agreed with the military judge's conclusion that very little time lapsed between the crime and the confrontation. Id. at *16, 2011 WL 891345, at *5.

Before this court, Baker filed a petition for review of the Court of Criminal Appeals decision as well as a motion to stay the proceedings pending the appeal. We granted Baker's assigned issue[4] and the motion for a stay.

### Standard of Review

The standard of review we apply in this case is critical to the outcome. "We review a military judge's ruling on a motion to suppress for abuse of discretion." United States v. Rodriguez, 60 M.J. 239, 246 (C.A.A.F. 2004) (citing United States v. Monroe, 52 M.J. 326, 330 (C.A.A.F. 2000)). "In reviewing a military judge's ruling on a motion to suppress, we review factfinding under the clearly-erroneous standard and conclusions of law under the de novo standard." United States

---

[4] See supra note 1.

9

United States v. Baker, No. 11-6007/AR

v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995). "Thus on a mixed question of law and fact . . . a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." Id. The abuse of discretion standard calls "for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" United States v. White, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting United States v. Lloyd, 69 M.J. 95, 99 (C.A.A.F. 2010)).

When reviewing matters under Article 62(b), UCMJ, the lower court may act only with respect to matters of law. United States v. Gore, 60 M.J. 178, 185 (C.A.A.F. 2004). "When a court is limited to reviewing matters of law, the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are 'fairly supported by the record.'" Id. (quoting United States v. Burris, 21 M.J. 140, 144 (C.M.A. 1985)). When reviewing a ruling on a motion to suppress, "we consider the evidence in the light most favorable to the prevailing party." United States v. Cowgill, 68 M.J. 388, 390 (C.A.A.F. 2010) (quoting United States v. Reister, 44 M.J. 409, 413 (C.A.A.F. 1996)). As we "pierce the intermediate level of appellate review and examine the military judge's ruling directly," Baker is the prevailing party in this case. United States v. Meghdadi, 60 M.J. 438, 441 (C.A.A.F. 2005).

10

### Discussion

In reviewing the admissibility of eyewitness identification we look to M.R.E. 321(a)(1),(a)(2)(B), and (d)(2), which codify the two-part test established by the Supreme Court in Neil v. Biggers, 409 U.S. 188, 199-200 (1973).  Rhodes, 42 M.J. at 290.  Initially the trial court determines whether the pretrial identification was "unnecessarily suggestive," and then if so, determines whether it was "conducive to a substantial likelihood of misidentification." Id.  This second inquiry centers on the reliability of the identification as determined by an application of the Biggers factors.  Id. at 291.  Even if the pretrial identification is ultimately held inadmissible, M.R.E. 321(d)(2) provides that "a later identification may be admitted if the prosecution proves by clear and convincing evidence that the later identification is not the result of the inadmissible identification."

Both the military judge and the Army Court of Criminal Appeals appear to have proceeded directly to an analysis of the Biggers factors.[5]  The lower courts then relied on their analysis

---

[5] Under the Rhodes and Biggers criteria, if a pretrial identification is not "unnecessarily suggestive," there is no need to proceed to the Biggers factors to determine whether the identification was "conducive to a substantial likelihood of misidentification."  See Rhodes, 42 M.J. at 291; Biggers, 409 U.S. at 199.

United States v. Baker, No. 11-6007/AR

of the Biggers factors to determine whether the identification was "unnecessarily suggestive" as well as whether it was "conducive to a substantial likelihood of misidentification." Baker, 2011 CCA LEXIS 52, at *13-*18, 2011 WL 891345, at *4-*6. In our analysis, we will address the two-part evaluation set forth in Rhodes.

I.   Was the Pretrial Identification Unnecessarily Suggestive?

Baker argues that showing KTB a single digital photograph of Baker was unnecessarily suggestive because this type of "show-up" procedure is "inherently suggestive" and was described by the Supreme Court in Stovall v. Denno, 388 U.S. 293, 302 (1967), as "widely condemned."  Baker argues the suggestiveness of the show-up was exacerbated by the police officer's comment that they "found someone that [KTB] should take a look at." The Government responds that the photo ID was not unnecessarily suggestive because it took place immediately after the incident, the police stopped the accused only after determining that he matched the entire description given by KTB, and they made sure KTB's description matched the suspect before showing her the picture.

"Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous."  Biggers,

12

409 U.S. at 198. "[S]howing a suspect singly to a victim is pregnant with prejudice. The message is clear: the police suspect this man. That carries a powerfully suggestive thought. . . . When the subject is shown singly, havoc is more likely to be played with the best-intended recollections." Biggers v. Tennessee, 390 U.S. 404, 407 (1968).

Weighing the evidence in the light most favorable to the prevailing party, the military judge did not abuse his discretion when he held that the initial identification was unnecessarily suggestive. In addition to the police officer's comment that they had "found someone that [KTB] should take a look at," the image of Baker shown to KTB was displayed on a relatively small digital camera screen and depicted a rider without a helmet or sunglasses, unlike the rider KTB encountered. The military judge also found that KTB only mentioned that the assailant might have had a mustache after she viewed the image, and only then did Officer Gress zoom-in on the image and confirm the mustache. These factors coupled with the suggestive nature of a show-up photo identification procedure, created a scenario that was unnecessarily suggestive. We therefore proceed to an analysis of the Biggers factors to determine whether the identification was nevertheless reliable.

II. Was the Unnecessarily Suggestive Pretrial Identification Conducive to a Substantial Likelihood of Misidentification?

As in Biggers, we now address the central question, "whether under the 'totality of the circumstances,' the identification was reliable even though the confrontation procedure was suggestive." Biggers, 409 U.S. at 199. Because the military judge provided a detailed ruling evidencing an accurate understanding of the Biggers factors and their application to the facts on the record, we give deference to his ruling in our analysis. See United States v. Briggs, 64 M.J. 285, 287 (C.A.A.F. 2007) (citing United States v. Downing, 56 M.J. 419, 422 (C.A.A.F. 2002)).

A. Opportunity of the Witness to View the Criminal at the Time of the Crime

The military judge and the Army court disagreed about the sufficiency of KTB's opportunity to view her assailant. The military judge noted KTB's "nearsightedness," and concluded that she had "minimal opportunity and capacity" to view the rider. He explained, "[o]ther than the few moments that she was extremely close with the rider during the assault itself, her nearsightedness alone prevented her from getting a clear look at the rider." (Emphasis added.) In contrast, the Army court found that when the assailant approached KTB with his penis in his hand, she had a "concentrated period of at least one to two minutes to view the rider's face." 2011 CCA LEXIS 52, at *13,

2011 WL 891345, at *4 (emphasis added).  While Baker argues that this amounts to an impermissible finding of fact by the Army court in violation of Article 62, UCMJ, which confines that court's jurisdiction to matters of law, the Government suggests this comment "reflects a legally permissible conclusion based on the facts as found by the military judge."

In its opinion, the Army court wrote "[t]he factual findings set forth by the military judge . . . and his additional factual findings in the record are not clearly erroneous and thus, we adopt them."  Id. at *2, 2011 WL 891345, at *1.  However, the military judge's ruling did not find that KTB had "at least one to two minutes" to view the rider's face, nor is this fact reflected in KTB's testimony at the hearing on the motion.  We disagree with the Government's suggestion that this statement does not constitute an additional fact, but reflects a mere difference in the interpretation of facts found by the military judge.[6]  While the dissent regards the difference between the military judge's finding of a "few moments" and the Army court's finding of "one to two minutes" as merely a

---

[6] The Government's argument at the trial level is consistent with this conclusion.  At the hearing on the Government's motion for reconsideration, the Government urged the military judge to adopt additional findings of fact.  Although the military judge did adopt additional findings, he did not adopt all the findings urged by the Government.  On appeal the Government now argues that the unadopted findings are not facts, but simply a different interpretation of facts that were found by the military judge.

15

difference in the manner in which KTB's testimony was "characterized" by the lower courts, United States v. Baker, __ M.J. __ (7 n.1) (C.A.A.F. 2011) (Baker J., dissenting), this temporal difference is more than a mere difference in interpretation or characterization of KTB's testimony. The Army court's finding is clearly distinct from, and indeed contrary to, the findings of the military judge. There is no evidence in the record or in the military judge's findings that the encounter between KTB and the rider lasted "at least one to two minutes."

As the Army court has no authority to find facts in an Article 62, UCMJ, appeal, that court's determination that KTB had "a concentrated period of at least one to two minutes to view the rider's face" amounts to an impermissible finding of fact. 2011 CCA LEXIS 52, at *13, 2011 WL 891345, at *4. This erroneous finding is particularly problematic as the Army court relied upon it for support of its determination that the military judge erred in his analysis of this Biggers factor. Id. at *9, 2011 WL 891345, at *3.

The military judge concluded that KTB had only "minimal opportunity and capacity to view the rider" because "[o]ther than the few moments that she was extremely close" to the rider, her nearsightedness prevented her from getting a good look at the rider. In addition, the rider was wearing a helmet and

sunglasses at the time of the incident, thus KTB could not get a good view of the details of the rider's face even at close range.  Although KTB walked past the rider a few times before the incident, she testified that when she walks she is not focused on the people around her.  During the brief encounter when she was face-to-face with the assailant, she was "panicked and focused on getting away."

If, as the Army court determined, KTB had come face-to-face with the attacker for a "concentrated period of at least one to two minutes," a case could be made for the Army court's conclusion that she had ample opportunity to view the attacker. However, as discussed supra, the military judge concluded that she had only a few moments to view the rider up close.  When compared with other cases evaluating this factor, a few moments is not a significant amount of time to view the suspect.  See Manson v. Brathwaite, 432 U.S. 98, 114 (1977) (in finding identification reliable, Supreme Court noted that witness "looked directly at [the suspect]" for "two to three minutes"); Biggers, 409 U.S. at 200 (no substantial likelihood of misidentification where the witness "spent a considerable period of time with her assailant, up to half an hour"); Rhodes, 42 M.J. at 291 (show-up identification sufficiently reliable in part because the victim "had about 20 minutes to look at the perpetrator" during the incident).  Therefore, we hold the

military judge's analysis of this factor was fairly supported by the record and did not constitute an abuse of discretion.

B.   The Witness' Degree of Attention

The military judge and the CCA also disagreed over KTB's degree of attention to the rider.  The military judge concluded that KTB "did not pay particular attention to the rider's face" during their first few encounters and noted that KTB was panicked and focused on trying to get away during the assault. The Army court, in contrast, concluded "the rider repeatedly engaged in actions that drew KTB's attention to him" and "[s]he focused her full attention on him five times."  Baker, 2011 CCA LEXIS 52, at *13, 2011 WL 891345, at *5.  Here again the Army court referenced KTB's "extended face-to-face close encounter," which reflects a continued reliance on its impermissible finding of fact that KTB had at least one to two minutes to view the rider's face at close range.  Id. at *14, 2011 WL 891345, at *5.

Evaluating the witness' degree of attention is relatively straightforward and a high degree of attention is preferred.  In Rhodes, we held this factor favored the Government when the witness was "very attentive" during the incident.  Rhodes, 42 M.J. at 291.  The Supreme Court has considered whether the witness was a "casual or passing observer" versus a "specially trained" police officer who would be expected to pay scrupulous attention to detail.  Brathwaite, 432 U.S. at 115.  A witness'

18

stress or anxiety level can also play a role in their degree of attention, however courts differ as to whether heightened anxiety increases attentiveness or reduces the witness' focus on the details of the suspect.  See United States v. Garcia-Alvarez, 541 F.3d 8, 14 (1st Cir. 2008) (finding a witness' degree of attention would be high during traumatic events such as a robbery and a carjacking); but see Richardson v. Superintendent of Mid-Orange Correctional Facility, 621 F.3d 196, 204-05 (2d Cir. 2010) (witness may have had a "lack of focus" on the suspect during a traumatic incident).

The Army court concluded that KTB "focused her full attention on [the rider] five times, albeit for varying lengths of time."  Baker, 2011 CCA LEXIS 52, at *13, 2011 WL 891345, at *5.  However, this finding is not reflected in the military judge's ruling and cannot be relied upon by either this court or the Army court in determining whether the military judge abused his discretion.  The record reflects that KTB testified that she "is normally not focused on the people around her as she walks" and "[w]ithout her contacts, she can see and recognize people at close distances of 2 to 3 meters."  Thus, during the first few encounters with the rider, KTB was merely a "casual or passing observer" of the type noted in Brathwaite.  Only in the last instance, when the assailant exposed himself to KTB, would she have been focused on his face and features to any significant

19

degree.  However, as the military judge noted, KTB "was panicked and focused on getting away" during that last encounter. Accordingly, we conclude that the military judge did not abuse his discretion when he held that KTB's degree of attention to the rider was minimal.

  C. The Remaining Biggers Factors:  Accuracy of the Witness' Prior Description of the Criminal; Level of Certainty Demonstrated by the Witness at Confrontation; and Length of Time Between the Crime and the Confrontation

 In regard to the final three Biggers factors, there is no significant difference between the analysis of the military judge and that of the Army court.  As to the third prong, the military judge concluded that KTB gave a "somewhat accurate" description of the accused when he was apprehended and indicated that her description matched that of the suspect during the hearing on the motion to reconsider.  The Court of Criminal Appeals also concluded that the description given by KTB matched the photo of the accused.  2011 CCA LEXIS 52, at *14, 2011 WL 891345, at *5.  As to the fourth prong, the military judge and the Court of Criminal Appeals agreed that KTB had an extremely high level of certainty in the accuracy of her description.  Id. at *15, 2011 WL 891345, at *5.  Finally, as to the fifth prong, the military judge and the Court of Criminal Appeals also agreed that there was only a brief lapse of time between the crime and the confrontation.  Id. at *16, 2011 WL 891345, at *5.  We find no errors in these findings and conclusions.

20

    D.  Weighing of the Biggers Factors

    "Against these factors is to be weighed the corrupting effect of the suggestive identification itself."  Brathwaite, 432 U.S. at 114.  Reviewing courts must determine whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive. Biggers, 409 U.S. at 199.  We consider these guidelines under the abuse of discretion standard of review required in this case.  As such, our task is to determine whether the military judge's findings of fact are clearly erroneous or his conclusions of law are incorrect.  Ayala, 43 M.J. at 298.  As discussed above, the abuse of discretion standard requires "more than a mere difference of opinion."  White, 69 M.J. at 239.  The military judge's decision warrants reversal only if it was "'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'"  Id. (quoting Lloyd, 69 M.J. at 89).

    Accordingly, we cannot say the military judge abused his discretion when he held the show-up identification unnecessarily suggestive.  Given the facts found by the military judge and this court's and the Supreme Court's caution over the use of show-up identifications, the military judge's conclusion was not arbitrary or clearly unreasonable.  Nor can we find the military

21

judge's application of the Biggers factors to the facts of this case to be clearly erroneous.[7]

Even if another court may have drawn other findings based on the evidence, the military judge's decision cannot be reversed based on a mere difference of opinion or an impermissible reinterpretation of the facts by appellate courts. Further, the Army court's decision to vacate the military judge's ruling was based to a large degree on impermissible findings of fact.

Finally, the military judge's decision to suppress the in-court identification made by KTB was not clearly erroneous. M.R.E. 321(d)(2) states "if the military judge finds the evidence of identification inadmissible . . . a later identification may be admitted if the prosecution proves by clear and convincing evidence that the later identification is not the result of the inadmissible identification." Here the military judge concluded that KTB's in-court identification was

---

[7] The dissent suggests that there is "no analysis as to how the show-up used in this case, on this record, was 'conducive to a substantial likelihood of misidentification.'" Baker, __ M.J. __ (8) (Baker, J. dissenting). However, the military judge's ruling evaluated all of the requisite factors for determining the admissibility of an identification. He recognized that even though an identification may be unnecessarily suggestive, "[r]eliability, not procedure, is the constitutionality linchpin in determining the admissibility of pretrial and in-court identifications." While the military judge could have taken steps to more clearly separate his analysis of the first and second prongs of the constitutional test, his findings addressed

"significantly impacted by the suggestive close-up photo." Again, even if reasonable minds could differ about the application of the facts to the law, we cannot say that the military judge's decision to suppress the identifications was arbitrary or fanciful.

We find that the Army court erred in finding the military judge abused his discretion when he granted the defense motion to suppress the identifications.

## Conclusion

The decision of the United States Army Court of Criminal Appeals is set aside.

---

both and he evaluated each of the Biggers factors to assess the reliability of the identification in this case.

United States v. Baker, No. 11-6007/AR

BAKER, Judge, with whom RYAN, Judge, joins (dissenting):

I.  SUGGESTIVE IDENTIFICATIONS

In United States v. Rhodes, 42 M.J. 287, 290 (C.A.A.F. 1995), we adopted the two-part test established by the Supreme Court for assessing suggestive identifications:  (1) whether a pretrial identification was unnecessarily suggestive; and (2) if the pretrial identification was unnecessarily suggestive, whether there was a substantial likelihood of misidentification. Thus, regarding both in-court and out-of-court identifications, there is a critical relationship between suggestiveness and misidentification.  Neil v. Biggers, 409 U.S. 188, 198 (1972). Moreover, it is the substantial likelihood of misidentification that violates the accused's right to due process, not the suggestive methodology alone.  Id.  Conversely, if a lineup is not suggestive, then under the Rhodes test, the identification should not be excluded on the grounds of likely misidentification.  As the Supreme Court long ago concluded, "reliability is the linchpin in determining the admissibility of identification testimony."  Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

Caution is prudent when addressing a show-up.  "Generally, a showup by its very nature is suggestive" because it can increase the risk of misidentification.  Rhodes, 42 M.J. at 290. Where, for example, a victim of crime is uncertain as to the

identity of her assailant, but remembers generic details about height, weight, and race, there is a risk that a photograph of a single individual bearing those characteristics will prompt a victim to "identify" the person in the photograph as the perpetrator based on generic, and thus unreliable, characteristics alone. Such a risk is heightened in cases where law enforcement officials wittingly or unwittingly suggest to the victim that they have "caught the suspect," as well as in situations where the victim wishes to please investigators. The risk is compounded where a victim is later called upon and recalls specific details of the perpetrator without discerning between her original recollection of the suspect and her subsequent observation of a photograph.

But that is not this case. The victim in this case, Ms. T-B, did not describe a generic person of African American descent, which was then validated and reinforced by a specific photograph. Rather, the victim described an actual person with distinct and personalized detail. She did so immediately following her assault. She did so before law enforcement detained Appellant, and she did so before seeing the up-close show-up picture of Appellant. In addition, the victim identified discreet aspects of the accused's appearance that were not depicted in the photograph she was shown by German law enforcement; and did so before seeing the picture. Moreover, as

2

United States v. Baker, No. 11-6007/AR

Appellant's counsel acknowledged at oral argument, her prior description of her assailant was accurate in every respect. In other words, the picture reinforced the victim's prior recollection of her assailant; it did not create that recollection. This was not a situation where the identification was "all but inevitable under the circumstances." Biggers, 409 U.S. at 197 (citation and quotation marks omitted). Thus, whether or not the use of a show-up photo lineup in this case might be viewed as suggestive, it did not, and could not raise "'a very substantial likelihood of irreparable misidentification.'" Id. at 198 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).

## II. ABUSE OF DISCRETION

It is true that a military judge is accorded substantial discretion regarding factual findings. We have often stated that "[o]ur standard of review is to 'give due deference' to the judge's findings of fact and accept them 'unless unsupported by the evidence of record or . . . clearly erroneous.'" United States v. Salazar, 44 M.J. 464, 471 (C.A.A.F. 1996) (alteration in original) (citation omitted); see also United States v. Armstrong, 54 M.J. 51, 54 (C.A.A.F. 2000); United States v. Taylor, 47 M.J. 322, 325 (C.A.A.F. 1997). However substantial the grant of discretion might be, it is not a blind grant. "[A] finding is clearly erroneous when although there is evidence to

support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Martin, 56 M.J. 97, 106 (C.A.A.F. 2001) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948) (quotation marks omitted). An abuse of this particular grant of discretion may occur when the trial judge has considered incorrect factors or has failed to consider necessary factors. 2 Steven Childress & Martha Davis, Federal Standards of Review § 7.06, at 7-69 (4th ed. 2010); see, e.g., Motor Vehicles Manufacturers Ass'n v. State Farm Ins. Co., 463 U.S. 29, 43 (1983).

In reaching his conclusion that the pretrial and in-court identifications would be suppressed, the military judge in this case abused his discretion in three ways. First, the military judge omitted critical aspects of the victim's testimony from his review of the Biggers factors. This testimony was uncontested and uncontroverted. Thus, it needed to be addressed in one way or another -- counted or discounted -- especially where it facially contradicts the military judge's own conclusions. For example, in addressing the third Biggers factor (the accuracy of the witness's prior description) the military judge stated "Ms. [T-B], gave a somewhat accurate description of the accused when he was apprehended -- muscular, black male, with a slight mustache and wearing bicycle attire .

4

. . . [b]asically . . . a black male, wearing bicycle attire, riding along [a] trail." However, the record reflects that Ms. T-B gave a detailed description of her assailant and it was accurate in every detail provided. Among other things, she accurately described the color of his shirt, his pants, the gap in his teeth, the style of his bike, the nature of his sunglasses and of his helmet.

By further example, the military judge stated that "No evidence was presented as to the likelihood of other black males riding their bikes on this trail." In fact, the record reflects that immediately following the incident German police encountered two separate groups on the bike path each of which indicated that they had seen a person fitting the victim's description and the direction in which he was riding. Neither group indicated that they had seen any other person fitting that description.

Thus, if the military judge was correct that the victim's description was generic, two groups on the bike path indicated that there was only one person on the bike path they had seen who fit that description. Of course, the victim's description was not generic, but rather specific, and thus the issue is not whether there were other black males on the trail, but other black males fitting the victim's description of her assailant.

Military judges may differ in how they weigh these particular factors in light of the totality of the circumstances without abusing their discretion; however, they are not free to ignore facts in the record that should inform that analysis.

Second, the military judge abused his discretion by misapplying the law to the facts and concluding that Ms. T-B "had minimal opportunity and capacity to view the rider" and that her "degree of attention on the rider was minimal." The record reflects that the victim noticed her assailant repeatedly while taking her walk, here presented chronologically:

"I saw a bicycle driver pass by on top of the trail."

"I saw him. He drove by. I was still about 20 to 30 meters away from the trail."

"[T]hen I saw this bicycle rider again, and he was doing something on the bicycle. I was about 20 or 30 or 40 meters away and I saw him kneeling in front of his bike and doing something to the bike."

"I arrived closer to him about 7 or 8 meters away from him, and then I saw – then he looked at me, and he got back on his bike and drove away from me."

"At some point, I saw him again. He was standing next to bushes next to the trail, and it looked to me as someone being on the side there and urinating."

"[T]hen when I arrived closer he turned the face –- his head towards me and then I passed."

"I walked on and at some point he drove by me."

When asked by the trial counsel whether she saw his face, she responded: Yes, I did."

"I moved on, and at some point I saw him again in the bushes, standing in the bushes."

"I thought he has a weak bladder because he was standing there again, but when I came closer he turned around.  He had his penis in his hand, and came running towards me and was standing in front of me."

"30 or 40 centimeters when he was very close to me."[1]

Based on these encounters the victim identified the color of his

attire, the nature of his facial hair, and the gap in his teeth.

In my view, this does not reflect "minimal opportunity" to view

the rider or "minimal" attention on the part of the victim.

Neither, in my view, is this a matter upon which reasonable

---

[1] On an appeal under Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862 (2006), it is axiomatic that a court of criminal appeals is bound by the facts found by the military judge, unless those facts are clearly erroneous.  However, that court is not bound by a military judge's application of law to facts.  In this case, the parties dispute whether the lower court found additional facts when it concluded that the victim observed the accused for "at least one to two minutes" as opposed to "the few moments" found by the military judge. United States v. Baker, No. ARMY 20100841, 2011 CCA LEXIS 52, at *13, 2011 WL 891345, at *4 (A. Ct. Crim. App. Mar. 7, 2011). The same dispute exists regarding the court's conclusion that the victim observed the accused five times as opposed to the military judge's finding of four times.  Id., 2011 WL 891345, at *5.  In my view, the variance between these "facts" does not change the analysis.  The issue is whether the victim's identification of the accused was reliable and whether the show-up was unreasonably suggestive and conducive to a very substantial likelihood of misidentification.  Here, the critical "facts" are found in the testimony of the witness herself, not in the manner in which that testimony was characterized by the military judge and the Court of Criminal Appeals.

minds might differ, in which case we should defer to the military judge.[2]

Finally, the military judge did not follow the structure contemplated by Rhodes, Biggers, and Brathwaite, for addressing show-ups that might raise the risk of misidentification. In particular, after reviewing the Biggers factors the military judge concluded without more that "the manner in which the photo identification was conducted was unnecessarily suggestive and conducive to a substantial likelihood of misidentification." The military judge's conclusion does not indicate why, in this case and context, the show-up was unreasonably suggestive, aside from the fact a show-up format was used, especially where the victim described her perpetrator in unique detail before she was shown Appellant's picture and where that description included unique personal characteristics not depicted in the picture.

More importantly, the military judge's ruling never addresses the relationship between suggestiveness and misidentification. It may be that the Government did not carry its burden of persuasion on this point, but there is no analysis

---

[2] Thus, the majority's focus on whether the victim was "a 'casual or passing observer'" or a "'specially trained' police officer" is misplaced. United States v. Baker, __ M.J. __ (18) (C.A.A.F. 2011) (quoting Brathwaite, 432 U.S. at 115). The question is whether the victim had a qualitatively meaningful opportunity to observe the perpetrator or whether that opportunity was "minimal" as the military judge concluded. The answer is found in the victim's testimony.

as to how the show-up used in this case, on this record, was "conducive to a substantial likelihood of misidentification." In particular, the military judge did not discuss or explain why a misidentification was likely where the record indicates the following:  police responded immediately to the report of the incident on the trail; the trail was searched within the hour; two separate groups on the trail, in addition to the victim, had seen a person meeting the victim's description of her assailant and independently identified the direction the assailant was biking; neither group identified any other person meeting this description; the assailant was arrested at the end of the trail wearing the clothing the victim described; and, the victim identified unique features of the accused's face before being shown the close-up.  Whether or not the show-up was suggestive in this case, the Rhodes/Biggers/Brathwaite rationale requires that the relationship between suggestiveness and a "substantial likelihood of misidentification" be drawn.  A persuasive argument might exist, but it is an abuse of discretion to provide no analysis at all.  Therefore, I respectfully dissent.