# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39021**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Richard A. COLEMAN**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 15 August 2017

————————————

*Military Judge:* Matthew P. Stoffel.

*Approved sentence:* Bad-conduct discharge, confinement for 1 year, and reduction to E-1. Sentence adjudged 7 November 2015 by GCM convened at Edwards Air Force Base, California.

*For Appellant:* Major Jarett F. Merk, Major, USAF; Major Lauren A. Shure, USAF.

*For Appellee:* Major Mary Ellen Payne, USAF; Major Meredith L. Steer, USAF; Gerald R. Bruce, Esquire.

Before DREW, MAYBERRY, and DENNIS, *Appellate Military Judges.*

Chief Judge DREW delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge DENNIS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

DREW, Chief Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of two specifications of indecent exposure in violation of Article 120c, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920c, and

of one specification of false official statement in violation of Article 107, UCMJ, 10 U.S.C. § 907.[1] The court-martial sentenced Appellant to a bad-conduct discharge, confinement for one year, and reduction to E-1.

Appellant raises two assignments of error on appeal: (1) whether the military judge abused his discretion in admitting Ms. KN's eyewitness identification of Appellant, and (2) whether the Government violated Article 55, UCMJ, 10 U.S.C. § 855, and the Eighth Amendment[2] by denying Appellant proper medical care during his post-trial confinement. We find no prejudicial error and affirm. We hold that the field "showup"[3] identification in this case was not unnecessarily suggestive.

## I. BACKGROUND

Appellant was arrested by the Kern County, California, Sheriff's Office in a neighborhood near Edwards Air Force Base after Ms. KN reported that a man had exposed himself to her while she was walking her dogs. Appellant did not work or reside in the neighborhood. Ms. KN, a former member of the Army military police, called 9–1–1 and a police officer showed up at her house. She gave him a general description of the man she saw, including the tan colored hoodie and black Spandex shorts he was wearing. After driving around the neighborhood, the police encountered Ms. JW who said that a similarly dressed man had just exposed himself to her. She rode in the back of a police car and directed the police to the location where she had last seen the man and pointed him out. It had only been about five minutes since he had exposed himself to her. The police detained the man, who was later revealed to be the Appellant in this case. He was wearing a tan hoodie and black Spandex shorts with a five-inch cut in the front. Appellant's penis and testicles were fully exposed outside of his shorts. After handcuffing Appellant and placing him in the back of a different police car, another deputy returned to Ms. KN's residence. Ms. KN agreed to accompany law enforcement officers to determine if she recognized the man they had detained. As she rode in the

---

[1] The court-martial acquitted Appellant of an additional specification of indecent exposure and of failure to go, in violation of Article 86, UCMJ, 10 U.S.C. § 886.

[2] U.S. CONST. amend. VIII.

[3] "A 'showup' describes a confrontation in which a single suspect is presented to the witness who is asked whether this is the person who committed the crime." *United States v. Rhodes*, 42 M.J. 287, 289 n.4 (C.A.A.F. 1995) (citing *Neil v. Biggers*, 409 U.S. 188, 195 (1972)).

back of the police car, the deputy read the following to Ms. KN from the Kern County Sheriff's Office field identification admonishment card:

> We are detaining a person for you to view who may or may not be the person who committed the crime now being investigated. The fact that this person is detained and may or may not be handcuffed should not influence your decision. It is just as important to free innocent persons from suspicion as it is to identify guilty persons. . . . When we get there, I need [you] to please look at the detained person carefully. If you wish to see him or her walk or stand or move in any particular way, please tell me. Also, if you wish to see the person under different conditions or speak certain words or phrases, please tell me. . . . Please do not talk to anyone other than the officer while you are viewing the detained person. You are to keep an open mind and make up your own mind whether or not you can identify the detained person. After you have enough time to view this person, please tell the officer if the person detained was involved or not involved or you are unsure if the person was involved in the incident being investigated.

The police asked Ms. KN if she understood, and she said, "yes." They asked her if she had any questions. She said, "no." When they arrived at Appellant's location, the police officer turned on the high-intensity lights on top of the police car to fully illuminate another police car parked ahead of them and to help protect Ms. KN's anonymity. Another police officer brought Appellant out of the back of the police car ahead of them and Ms. KN, who had remained in the back of the police car that transported her, immediately positively identified Appellant. It had been 60 to 90 minutes since Appellant had exposed himself to Ms. KN. Ms. KN and Ms. JW both testified on the merits and positively identified Appellant as the man who had exposed himself to them. Appellant was ultimately convicted of indecently exposing himself to Ms. KN and Ms. JW.

Appellant served his confinement at the Naval Consolidated Brig Miramar (NCBM). Appellant indicates that when he was in-processed at NCBM, he informed the facility's medical providers of his various physical and psychological conditions. He now asserts for the first time on appeal that NCBM failed to provide him adequate medical treatment, his assigned work detail aggravated his back condition, and he never received any treatment for a claimed post-traumatic stress disorder (PTSD) diagnosis.

## II. DISCUSSION

### A. Pretrial Identification

Appellant challenges Ms. KN's pretrial identification of Appellant as he was brought out of a police car. The military judge applied the Supreme Court's two-part test in *Neil v. Biggers*, 409 U.S. 188 (1972), and found that the showup identification was "unnecessarily suggestive" but nevertheless admissible. While we agree with the military judge that the identification was admissible, we do not agree that, under the facts of this case, that the showup was *unnecessarily* suggestive.

We review a military judge's ruling on a motion to suppress a pretrial identification for an abuse of discretion. *United States v. Baker*, 70 M.J. 283, 287 (C.A.A.F. 2011) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004)). In reviewing a military judge's ruling to suppress a pretrial identification, we review the facts found by the military judge under the clearly-erroneous standard and his conclusions of law under the de novo standard. *Id.* (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). "Thus on a mixed question of law and fact . . . a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *Id.* (quoting *Ayala*, 43 M.J. at 298) (ellipsis in original). "The abuse of discretion standard calls for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id.* (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)) (internal quotation marks omitted). "When reviewing a ruling on a motion to suppress, 'we consider the evidence in the light most favorable to the prevailing party.'" *Id.* at 288 (quoting *United States v. Cowgill*, 68 M.J. 388, 390 (C.A.A.F. 2010)).

When an accused objects at trial to an eyewitness identification as being unreliable, the Government must prove by a preponderance of the evidence that the identification was reliable under the circumstances. Mil. R. Evid. 321(d)(2). "Even if the pretrial identification is ultimately held inadmissible, [Mil. R. Evid.] 321(d)(2) provides that 'a later identification may be admitted if the prosecution proves by clear and convincing evidence that the later identification is not the result of the inadmissible identification.'" *Baker*, 70 M.J. at 288.

To determine whether eyewitness identification is admissible, military courts employ the Supreme Court's two-part test in *Biggers*. *Baker*, 70 M.J. at 288 (citing *United States v. Rhodes*, 42 M.J. 287, 290 (C.A.A.F. 1995)). We must first determine whether the pretrial identification was "unnecessarily suggestive." *Id.* If it was not unnecessarily suggestive, the identification is admissible (unless some other basis supports its suppression). If we find that

the identification is unnecessarily suggestive, we move to the second part of the test to determine if the identification was "conducive to a substantial likelihood of misidentification." *Id.*

The military judge made the following findings of fact, which are not clearly erroneous and we adopt as our own:

> [Appellant] is a male Caucasian. In February 2015, [Appellant] was 39 years of age, 6' 3" tall, and weighed 220 pounds. On 10 February 2015, at approximately 1630 hours, [Ms. KN] encountered a male Caucasian in her neighborhood in Rosamond, California while she was walking her dogs. The sun had not yet set and there was sufficient daylight for [Ms. KN] to observe her surroundings. She was initially startled by the male she encountered as he appeared from around a corner. She observed the male with his hands in the front pocket of a tan sweatshirt. She also observed the male wearing black Spandex shorts, socks, and shoes. . . . [H]e was also wearing sunglasses and had the hood of his sweatshirt pulled around his head such that his ears and forehead were covered. The male asked [Ms. KN] "How is your day?" or words to that effect. After responding briefly, [Ms. KN] looked down to continue walking her dogs and observed the man's semi-erect penis and testicles protruding through a hole in his Spandex shorts. [Ms. KN] walked away towards her house but continued to look behind her to locate the whereabouts of the male. After following her briefly, the male turned away outside of her sight. [Ms. KN] returned home, called her husband, and then called 9–1–1. She reported what occurred and provided a description of the individual she observed. Police were dispatched in response. Deputies patrolling in the area inquired of two females whether they observed anyone matching the male's description. One indicated that she had and pointed to where she had seen the individual walking.

> The other, [Ms. JW], also indicated she saw the individual and explained that the individual had exposed himself to her. [Ms. JW] agreed to get in the patrol car in an attempt to locate the individual. Within a minute of entering the patrol car, [Ms. JW] and Deputy [BH] observed an individual walking down the sidewalk. [Ms. JW] indicated she was too far away to tell whether it was the same individual; but, after moving closer, [Ms. JW] indicated with a high degree of certainty that the individual walking was in fact the individual who exposed himself to her. Deputy [BH] stopped the individual, detained him,

and set him on the sidewalk. The detained individual was [Appellant]. [Appellant] was wearing a tan hooded sweatshirt, Spandex shorts with a hole in the crotch area, and shoes and socks. [Ms. KN] was asked by Deputies if she would be willing to attempt to identify the perpetrator. After explaining the procedures to her, [Ms. KN] agreed. She was transported in the back of a patrol car to where [Appellant] was being detained. Upon arrival at the scene, [Appellant] was taken out of the back of another patrol car. Between sunlight and the lights on the patrol car, there was sufficient lighting for [Ms. KN] to observe [Appellant]. [Ms. KN] immediately identified [Appellant] as the perpetrator with a high degree of certainty.

While the military judge did not mention the field identification admonishment card, we find it highly probative. The contents of the card were developed by the Kern County Sheriff's Office's legal department. In particular, the police emphasized to Ms. KN that "[i]t is just as important to free innocent persons from suspicion as it is to identify guilty persons" and that she was "to keep an open mind and make up [her] own mind whether or not [she] can identify the detained person." This advice, before she ever saw Appellant get out of the back of a police car, is significant in evaluating the degree of suggestiveness and likelihood of misidentification in Ms. KN's showup identification.

In addition, while the military judge described Ms. KN as identifying Appellant "as the perpetrator with a high degree of certainty," she testified as to exactly how highly certain she was. She consistently testified that she was "a hundred percent" certain. When asked what was it about him that made her 100-percent certain, she listed off "the tan sweatshirt, the black Spandex, . . . the socks, the shoes, the shape of his face, the skin tone, stature, everything." When asked if she had any doubt about her identification, she responded "no doubt whatsoever." She further testified that she did not feel influenced, "not at all," by the police to identify Appellant. In response to questions from the military judge, she testified that she noticed Appellant's nose, forehead, cheek bones, and jawline, "That is what we were trained to do in the military is to, as a cop, is to really, you know, observe a scene and recall it."

### 1. Was the Pretrial Identification Unnecessarily Suggestive?

"Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Biggers*, 409 U.S. at 198. "[S]howing a suspect singly to a victim is pregnant with prejudice. The message is clear: the police sus-

> pect this man. That carries a powerfully suggestive thought.
> . . . When the subject is shown singly, havoc is more likely to be
> played with the best-intended recollections." *Biggers v. Tennessee*, 390 U.S. 404, 407, 88 S. Ct. 979, 19 L. Ed. 2d 1267 (1968).

*Baker*, 70 M.J. at 288 (ellipsis in original).

> Generally, a showup by its very nature is suggestive. However,
> it is not enough merely to establish that a showup is suggestive. Due process is not violated unless there is an "unnecessarily suggestive" pretrial identification that leads to a substantial likelihood of mistaken identity at the time of trial. An
> immediate identification while the witness' memory is still
> fresh and when there are no grounds for holding a suspect has
> been held not to be unnecessary under the Due Process Clause
> of the Fifth Amendment. *Johnson v. Dugger*, 817 F.2d 726, 729
> (11th Cir. 1987); *State v. Perkins*, 141 Ariz. 278, 686 P.2d 1248,
> 1259 (1984). It is important to have a one-on-one confrontation
> take place immediately after a crime while memories are fresh
> so innocent individuals may be released. *Id.* An immediate confrontation permits investigative activities to be refocused if
> there is no identification. *State v. Collette*, 199 Conn. 308, 310-
> 11, 507 A.2d 99, 101 (1986).

*Rhodes*, 42 M.J. at 290–91. "[R]eliability, not necessity, is the 'linchpin in determining the admissibility of identification testimony . . . .'" *Sumner v. Mata*, 446 U.S. 1302, 1304 (1980) (quoting *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977)). In determining whether pretrial identification procedures are unnecessarily suggestive, we consider the totality of the circumstances. *Foster v. California*, 394 U.S. 440, 442 (1969) (citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).

The military judge determined that the showup was unnecessarily suggestive. The factors he listed were that Ms. KN viewed Appellant while she was sitting in the back of a police car, she made her identification after Appellant was pulled out of the back of a police car under circumstances where it was obvious he was being detained by the police, Appellant was the only person shown to her, and the police had probable cause to arrest Appellant and detain him for sufficient time to conduct a lineup. In concluding that the showup was unnecessarily suggestive, the judge did not mention the use of the field identification admonishment card, Ms. KN's immediate and 100-percent certain identification of Appellant, the bright lights from the police car used to fully illuminate Ms. KN's view from the back seat of the police car, or the need to very quickly conduct the identification while the memory

of Appellant's image was still extremely fresh in Ms. KN's military police-trained mind.

We review the military judge's conclusion of law that the showup was unnecessarily suggestive de novo. Doing so, we disagree with the conclusion reached by the military judge.

Just as in *Rhodes*, this showup was, by its very nature, suggestive. However, we do not believe it was unnecessarily so under the totality of the circumstances. This was not the more typical situation in which the police have time, on a later date, to arrange a photo or live lineup. Appellant was still on the scene wearing the exact same clothing, minus his sunglasses, that he had been wearing when Ms. KN first saw him.[4] That clothing, along with his physical characteristics, featured prominently in Ms. KN's initial description and confirmatory identification. Appellant had just exposed himself to Ms. KN a mere 60 to 90 minutes prior and her ability to accurately recall what she observed was at its zenith. A physical lineup later with others dressed differently would have been even more suggestive than the conditions of this particular showup. It may or may not have been feasible to try to arrange for roughly similar clothing for others to wear during such a lineup. A photo lineup from the waist up, having others wear the same hoodie would have been possible, but would have removed key identifying features in Ms. KN's initial description.[5]

---

[4] Apparently, Appellant's penis and testicles were still fully outside of his Spandex shorts during the identification, although the police did their best to pull his hoodie down over them, so as not to subject Ms. KN to any further indecency. During her testimony, she made no mention of observing Appellant being exposed during the identification.

[5] The police did use a photo lineup in this case for the specification of indecent exposure, of which Appellant was acquitted. It stemmed from a report by two women a week later in the same neighborhood of an individual described wearing very similar clothing and exposing himself under very similar circumstances. The police suspected that Appellant was involved. Rather than show the eyewitnesses just Appellant's booking photograph (a "photo showup"), they used a computer program to find similar booking photographs and conducted a photo lineup using five photographs of different individuals. One of the eyewitnesses identified Appellant. One could not identify any of them. Although one of the other photos showed an individual in a somewhat similar sweatshirt, none of the others did. The most significant difference between the two identification procedures was that in the latter incident there was no urgency, as the suspect was not still on the scene wearing the same clothes that he had allegedly worn during the crime.

What makes a showup suggestive is that it sends the clear message that the police suspect the individual. However, in this case, that "powerfully suggestive thought" was ameliorated by the prophylactic use of the field identification admonishment card *before* Ms. KN made her identification. She was told that the individual "may or may not be the person who committed the crime now being investigated. The fact that this person is detained . . . should not influence your decision" and that she is "to keep an open mind and make up your own mind whether or not you can identify the detained person." The police also emphasized that "[i]t is just as important to free innocent persons from suspicion as it is to identify guilty persons." While we do not suggest that showup identifications are preferred when a traditional photo or live lineup would be more appropriate, we approve of the use of a field identification admonishment card and recommend the use of a similar admonishment in the future before any showup identification in the field by military law enforcement.

The timing of the showup within an hour and a half of the incident, the prophylactic use of the field identification admonishment card before Ms. KN made her identification, her forceful statement that she felt she was "not at all" influenced by the police, her prior military police training, and the other facts and circumstances of this case, convinces us that the showup was not *unnecessarily* suggestive.

### 2. Was the Identification Conducive to a Substantial Likelihood of Misidentification?

Assuming arguendo that the showup *was* unnecessarily suggestive, as in *Rhodes*, we will, applying the six-factor *Biggers* / *Rhodes* test, evaluate the second prong to determine whether there was a reliable identification at trial:

> The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199–200. In addition to the *Biggers* factors, our superior court added an additional one to consider: the likelihood of other individuals in the area at the time of the offense matching the description given by the witness. *Rhodes*, 42 M.J. at 291.

9

The military judge made the following findings of fact concerning the *Biggers* factors:

> While her interaction with [Appellant] was brief, she had sufficient opportunity to observe [Appellant] at the scene of the offense. She observed [Appellant] face to face. She had the opportunity to observe what he was wearing and the location of his hands. She also had the opportunity to observe [Appellant] briefly as she looked back in his direction while leaving the area. [Ms. KN]'s attention was heightened due to her suspicion being raised. Her training and experience as an Army MP played a role in heightening her attention making her unlike a casual or passing observer and more akin to a specially trained police officer despite her current civilian status. [Ms. KN] accurately described [Appellant] as the perpetrator before being subjected to the unnecessarily suggestive show-up identification. While she did not describe particulars about [Appellant]'s face, she did accurately describe [Appellant]'s race, attire, height, weight, and age. [Ms. KN]'s level of certainty was high. After having been admonished by law enforcement, she promptly expressed 100-percent certainty that [Appellant] was the perpetrator upon being shown [Appellant]. No one prompted her or encouraged her in any way to positively identify [Appellant] as the perpetrator. The length of time between the alleged offense and [Ms. KN]'s identification weighs in favor of reliability. Approximately 60 to 90 minutes transpired between the events. Based on the prompt law enforcement response, her recollection of [Appellant] was still fresh in her mind when at the show-up identification.

Considering the evidence in the light most favorable to the prevailing party on the motion to dismiss, we find that the military judge's findings of fact were not clearly erroneous and we adopt them as our own. We also consider the additional *Rhodes* factor and find that it is highly unlikely that other individuals in the area at the time of the offense matched the description given by the witness. In addition to testimony that no one else was seen in the neighborhood at the time wearing a tan hoodie and black shorts, Appellant's Spandex shorts were exactly as described when he was detained by the police. Specifically, as Ms. KN told the 9–1–1 operator, he "had everything hanging out."

We are convinced that Ms. KN gave a reliable identification at trial, regardless of the degree of suggestiveness of her prior showup identification.

**B. Conditions of Appellant's Post-Trial Confinement**

"We review allegations of cruel or unusual punishment under a de novo standard." *United States v. Pena*, 64 M.J. 259, 265 (C.A.A.F. 2007) (citing *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001)). "In our evaluation of both constitutional and statutory allegations of cruel or unusual punishment, we apply the Supreme Court's Eighth Amendment jurisprudence 'in the absence of legislative intent to create greater protections in the UCMJ.'" *Id.* (quoting *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006)). The Eighth Amendment prohibits "cruel and unusual punishments." U.S. CONST. amend. VIII. Similarly, Article 55, UCMJ, 10 U.S.C. § 855, prohibits "cruel or unusual punishment." "Denial of adequate medical attention can constitute an Eighth Amendment or Article 55 violation. A failure to provide basic psychiatric and mental health care can constitute deliberate indifference. However, it is not constitutionally required that health care be 'perfect' or 'the best obtainable.'" *White*, 54 M.J. at 474–75 (quoting *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991)) (citations omitted).

To support a claim that conditions of confinement violated the Eighth Amendment, an appellant must show:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [the appellant's] health and safety; and (3) that he "has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ, 10 USC § 938 [2000]."

*Lovett*, 63 M.J. at 215 (quoting *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997)) (ellipsis in original). An appellant must establish, "absent some unusual or egregious circumstance, that he has exhausted the prisoner-grievance system." *Miller*, 46 M.J. at 250 (quoting *United States v. Coffey*, 38 M.J. 290, 291 (C.M.A. 1993)).

Appellant supports his claims of improper medical care through his own declaration. In response, the Government has provided a declaration for the NCBM Parole and Release Director, a copy of Appellant's medical records, and other documents from his prisoner file. Appellant provides no indication that, other than requesting certain medical treatment from medical providers, he attempted to use the prisoner grievance system or to file an Article 138 complaint. The Parole and Release Director's declaration conclusively establishes that he did neither.

Our cursory review of Appellant's medical records indicate that he received appropriate medical care during his confinement. However, we are not

medical experts. Such is the reason for the requirement for exhaustion of available remedies. It affords the prison system the opportunity to bring to bear qualified medical experts to evaluate a claim of improper care and to, more importantly, provide any needed care in a timely fashion. This is far preferable to raising an unripe claim to an appellate court that is in no position to provide any needed care that might be appropriate.

Appellant has not established any unusual or egregious circumstances that would justify his failure to exhaust his available administrative remedies and thus his asserted error must fail on that basis. Nevertheless, our independent review, medically inexpert though it may be, provides us no reason to believe that the conditions of Appellant's confinement constituted cruel or unusual punishment under the Eighth Amendment or Article 55.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court

12