# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

—————————————

## No. 201700098

—————————————

### UNITED STATES OF AMERICA
Appellee

v.

### JOSEPH M. WILSON
Midshipman, U.S. Navy
Appellant

—————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges: Commander Robert P. Monahan, Jr., JAGC, USN (arraignment); Captain Charles N. Purnell, JAGC, USN (trial).
For Appellant: William E. Cassara, Esquire;
Lieutenant Doug R. Ottenwess, JAGC, USN.
For Appellee: Lieutenant Allyson L. Breech, JAGC, USN; Lieutenant Megan P. Marinos, JAGC, USN.

—————————————

Decided 20 September 2018

—————————————

Before WOODARD, FULTON, and JONES, *Appellate Military Judges*

—————————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

—————————————

JONES, Senior Judge:

A panel of officers sitting as a general court-martial convicted the appellant, contrary to his pleas, of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012). The panel sentenced the appellant to 30 months' confinement, forfeiture of all pay and allowances, and a dismissal. The convening authority approved the adjudged sentence and, except for the dismissal, ordered it executed.

The appellant asserts four assignments of error (AOE): (1) the evidence is factually insufficient; (2) the appellant's due process right to notice was violated; (3) the military judge erred by admitting uncharged acts of sexual misconduct; and (4) the military judge abused his discretion by granting a challenge for cause of a court member. We disagree and, finding no error materially prejudicial to the substantial rights of the appellant, affirm the findings and sentence. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

The appellant and MH were midshipmen at the United States Naval Academy. On 3 and 5 June 2015, they practiced ju-jitsu together at the Academy's fieldhouse, with the appellant assuming the role of teacher. At the first session they were accompanied by MH's roommate, and nothing sexual occurred between MH and the appellant. But on 5 June 2015, the two were alone in the fieldhouse and their practice session turned sexual when the appellant began rubbing MH's vagina over her clothes. MH permitted this, but twice moved away from the appellant when he tried to remove her shorts. MH explained to the appellant that she was a victim of a past sexual assault and needed an emotional connection before she could have sex with someone. The appellant acknowledged her concerns and stopped his sexual advances.

When the practice session ended, the two went to dinner together and then to the appellant's room to watch a science video. At some point, the appellant placed his hand on MH's leg, and then on her vagina, over her clothes. MH did not object to these actions. The appellant then placed his hands on MH's hips and guided her to a standing position. He pulled MH's pants and underwear down, pulled his own pants down, and pressed MH against the desk, with her buttocks touching the desk. The appellant then penetrated MH's vulva with his penis. MH responded by pushing the appellant off of her and pulling up her underwear and pants.

MH then reminded the appellant—in more explicit terms—of her prior sexual assault and that she did not want to have sex with him. She told him she "fe[lt] like an object" because she was not "having an intimate connection" with him.[1] MH told the appellant that she needed to feel in control to engage in sexual activity, and that having sex with him on the desk failed to give her that control. In response, the appellant suggested that if he sat on a chair and she straddled him, she would be in control. In an attempt to "remain close with him," MH agreed to engage in further sexual activity on the chair. She removed one leg from her pants and underwear and mounted the appellant, who was seated on the chair.[2] But as the appellant began thrusting

---

[1] Record at 459.

[2] *Id.* at 461.

2

inside of her, she felt more and more uncomfortable with the situation, and abruptly stopped the coitus by lifting herself off of the appellant. At trial, MH described how she told the appellant again that she did not want to have sex with him.

> At this point my emotions were really high, and I told him that I didn't want to be f****d because I felt as though . . . I still wasn't getting that . . . intimate connection, and it still felt like I was just there to please him, and it was not how I wanted it to go.[3]

Before MH could put her pants back on, however, the two heard the appellant's roommate entering the adjoining room. As having a member of the opposite sex in the room with the door closed was prohibited in the barracks, they attempted to conceal their activity. The appellant guided MH onto his desk, which was directly underneath his elevated bed, and placed a backpack in front of her so she would not be discovered. While the appellant distracted his roommate in the bathroom, the appellant motioned for MH to climb from the desk up into his bed where she was concealed behind the privacy curtain. She was still naked from the waist down.

After a few moments, the roommate departed. The appellant then climbed into the bed, joining MH. When he did so, MH moved from lying on her stomach to lying on her back. When the appellant placed his hand on her leg, she responded by telling him "just hold me."[4] The appellant replied "okay."[5] She then turned onto her right side so she was facing the wall and her back was up against the appellant's chest. MH testified that the appellant held her for only a "matter of seconds"[6] before rolling her onto her stomach and placing his weight on top of her. She testified that the appellant said nothing, but placed his knees between her legs and forcibly spread them apart. He then reached underneath MH, briefly rubbed her vagina with his hand, and then penetrated MH's vulva with his penis. MH testified that she completely froze; she did not say or do anything in response. After a few moments, MH asked the appellant to get a condom. MH testified that she asked the appellant to get a condom because just saying no, as she had done before, was not working and she could not think of anything "that would make him care."[7] When the appellant left to get the condom, MH testified that although she wanted to

---

[3] *Id.*

[4] *Id.* at 465.

[5] *Id.*

[6] *Id.* at 466.

[7] *Id.* at 468.

leave, she could not move. As she explained, "it was as if all of [her] limbs were against her, and they wouldn't—wouldn't let [her] leave."[8] MH testified that when the appellant returned to the bed with the condom and once again penetrated her vulva with his penis, she clenched her fist and expressed to him, "you don't have to do this."[9] Again, she related the appellant said nothing, but continued to penetrate her from behind until he ejaculated. The appellant was charged only with sexually assaulting MH in his bed.

Additional facts necessary to resolution of the AOEs are included below.

## II. DISCUSSION

### A. Factual sufficiency

*1. The law*

The appellant asserts the sexual assault conviction is factually insufficient.[10] Specifically, the appellant argues that the government failed to prove beyond a reasonable doubt that MH did not consent to the sexual act in the appellant's bed. Alternatively, he avers that the government failed to prove beyond a reasonable doubt that he did not honestly and reasonably believe that she had consented.

We review questions of factual sufficiency *de novo*. Art 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation, internal quotation marks, and emphasis omitted). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the

---

[8] *Id.*

[9] *Id.* at 469.

[10] Although the appellant does not challenge the legal sufficiency of the abusive sexual contact convictions, we are mindful that Article 66(c), UCMJ, requires this court "to conduct a *de novo* review of [both the] legal and factual sufficiency of the case." *Washington*, 57 M.J. at 399 (citation omitted). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297-98, (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). We find the evidence legally sufficient.

evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

The appellant was charged and convicted of sexual assault in violation of Article 120(b)(1)(B), UCMJ. To convict the appellant, the government was required to prove the following elements:

(1) That the accused committed a sexual act upon MH by causing penetration, however slight, of [her] vulva . . . by [his] penis;

(2) That the accused did so by causing bodily harm to MH;[11] and

(3) That the accused did so without the consent of MH.[12]

Bodily harm "means any offensive touching of another, however slight, including any nonconsensual sexual act[.]"[13] In this case, the bodily harm alleged was "penetrating her vulva with his penis."[14] "When the same physical act is alleged as both the *actus reus* and the bodily harm for the charged sexual assault, the government must prove lack of consent as an element."[15] In other words, the government must prove beyond a reasonable doubt that MH did not consent to the physical act.[16]

> The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating relationship or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.[17]
>
> Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or

---

[11] MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) (MCM), Part IV, ¶ 45.a.(b)(1)(B).

[12] Military Judges' Benchbook, Dept. of the Army Pamphlet 27-9 at 574 (10 Sep 2014).

[13] MCM, Part IV, ¶ 45.a.(g)(3).

[14] Charge Sheet.

[15] Military Judges' Benchbook at 575.

[16] *United States v. Guin*, 75 M.J. 588, 592-93 (N-M. Ct. Crim. App. 2016), *rev. denied*, 75 M.J. 367 (C.A.A.F. 2016).

[17] MCM, Part IV, ¶ 45.a.(g)(8)(A). *See also* Military Judges' Benchbook at 576.

whether a person did not resist or ceased to resist only because of another person's actions.[18]

Evidence of a misunderstanding of the circumstances surrounding an offense may give rise to the defense of mistake of fact. "[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." RULE FOR COURTS-MARTIAL (R.C.M.) 916(j)(1), MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2012 ed.). The evidence triggering the mistake of fact defense must show that the accused's mistake was both honest and reasonable. *United States v. Hibbard*, 58 M.J. 71, 72 (C.A.A.F. 2003). Although the appellant bears the burden of raising some evidence of a mistake of fact, the burden remains on the government to prove, beyond a reasonable doubt, that there was neither consent nor an honest and reasonable mistake of fact as to consent.

### 2. Application of the law to the facts

We are convinced that MH did not consent to the sexual intercourse in the appellant's bed, and that the appellant was not under the mistaken belief that she consented. It is indisputable that MH engaged in consensual sexual intercourse with the appellant twice that evening immediately prior to the charged offense; she ultimately testified that the sex on the desk and in the chair were both consensual encounters. But it is axiomatic that a woman may revoke consent to sexual intercourse at any time—even immediately after initially consenting to it.

Before 5 June 2015, the appellant and MH had had no romantic or sexual interactions. From the first sexual encounter at the fieldhouse—when MH rebuffed the appellant's repeated efforts to remove her shorts—MH put the appellant on notice that she was a victim of prior sexual abuse and that she needed an emotional connection prior to having sex with him. After abruptly stopping the sexual encounter in the chair, MH told the appellant, "I don't want to be f****d."[19] Then in the bed some moments later, when the appellant touched her leg in an attempt at foreplay, MH reiterated that she did not want to have sex when she told the appellant to "just hold [her]."[20] The appellant verbally acknowledged this boundary set by MH when he responded "okay."[21] But then, without any verbal or physical warning, the appellant

---

[18] MCM, Part IV, ¶ 45.a.(g)(8)(C). *See also* Military Judges' Benchbook at 576.

[19] Record at 461.

[20] *Id.* at 465.

[21] *Id.*

rolled MH onto her stomach, forcefully spread her legs with his knees, rolled over onto her, and penetrated her vulva with his penis. In doing so, the appellant sexually assaulted MH because she had physically and verbally withdrawn her consent to sexual intercourse in the chair and then again verbally reiterated that lack of consent before he penetrated her vulva with his penis in the bed.

MH testified that during the assault she froze and felt helpless because all of her previous attempts to communicate her need for intimacy before engaging in sex had failed.[22] But unlike the two previous sexual encounters in the room where MH could disengage from the appellant, in the small bed above the appellant's desk there was nowhere for her to escape. MH testified that when she realized that the appellant was going to have sex with her without her consent, she asked him to use a condom. We do not find that MH's request that the appellant get a condom transformed a sexual assault into a consensual sexual encounter. *See United States v. Robinson*, No. 200000681, 2003 CCA LEXIS 163 at *10, (N-M. Ct. Crim. App. 30 Jul 2003) (unpub. op.) (the victim's request that her assailant use a condom could not honestly and reasonably be interpreted as consent), *rev. denied*, 59 M.J. 474 (C.A.A.F. 2004). In fact, when the appellant returned to the bed, MH again manifested her lack of consent by clenching her fist and telling the appellant he did not have to do this to her. The appellant again said nothing. He did not seek clarification of MH's statement. His only response was to penetrate MH until he ejaculated. We are convinced that MH made her lack of consent to the sexual act in the appellant's bed reasonably manifest, and that she never freely agreed to the sexual act. In considering all of the surrounding circumstances, MH's expressions of lack of consent through her words and actions indicate there was no consent.

We are also convinced beyond a reasonable doubt that the appellant was not under the mistaken belief that MH consented to the sexual intercourse in the bed. The appellant knew that MH had just revoked her consent to sexual intercourse by abruptly stopping the sex in the chair and through the conversation that followed. In the bed, she again reiterated she was not interested in sex by telling the appellant she only wanted to be held. Finally, when the appellant returned with a condom, MH told him he did not have to do this to her. The appellant ignored these three stop signs. Even if we assume that the appellant had a reasonable mistake of fact that MH consented when he first penetrated her in the bed, we find that he was not mistaken as to her lack of consent when he returned with the condom and MH again verbally expressed her lack of consent. The evidence shows the appellant chose to ignore MH's readily discernable, and multiple verbalizations of her lack of consent. Fur-

---

[22] *See generally id.* at 467.

ther, assuming the appellant honestly believed MH consented to his advances, we find that belief unreasonable.

Furthermore, the parties' behavior after the incident supports MH's claim that the appellant sexually assaulted her. The appellant demonstrated a consciousness of guilt in his admissions to MH in an email a few days after the incident. In responding to MH's consternation over what had occurred that night, he conceded, "You're right, I messed up."[23] Later, he met with MH face-to-face in a stairwell and agreed that what had happened should not have happened. At that meeting, MH gave the appellant a deadline to report what he had done or else she would report it. The appellant never self-reported. So, three months after the incident, MH again confronted the appellant by email regarding her feelings about what the appellant had done to her. In response, the appellant admitted that "[w]hat happened has been haunting me as well . . . but . . . I am scared to even talk about something like that."[24] These admissions belie the appellant's mistake of fact claim and demonstrate his consciousness of guilt.

The government also called three of MH's classmates who testified that MH's demeanor noticeably changed after the incident and she became more quiet and withdrawn. They also testified that whereas she had been very involved in extracurricular activities, she scaled back her participation dramatically after the incident. This circumstantial evidence is consistent with MH's claim that she was sexually assaulted.

We find no persuasive motive why MH would fabricate the allegation.[25] It is true that being behind a closed door in a room of a member of the opposite sex and having sex with a fellow midshipman were against the Academy's rules and could have led to disciplinary action against MH. However, until MH reported the assault, there is no evidence anyone even knew she was in the appellant's room, let alone that she had engaged in sexual activity with him—to include the consensual sexual encounters in the appellant's room on the chair and desk. Accordingly, we reject the appellant's argument that that MH reported a consensual sexual encounter as a sexual assault to avoid getting into trouble.

Finally, we acknowledge there were inconsistencies in MH's testimony. But proof beyond a reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Diaz*, 61 M.J. 594, 599 (N-M. Ct. Crim. App. 2005), *aff'd*, 64 M.J. 176 (C.A.A.F. 2006). Overall, we find the victim's

---

[23] Prosecution Exhibit 4 at 1-2.

[24] *Id.* at 2.

[25] The government also presented unrebutted evidence of MH's good character for truthfulness.

testimony compelling and supported by the circumstantial evidence. After weighing all the evidence and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt.

## B. Due process right to notice

The appellant alleges for the first time on appeal that the government violated his due process right to notice by suggesting throughout the trial that the sex on the desk was nonconsensual. He avers this resulted in a fatal variance of the Specification of the Charge.[26] We disagree.

The appellant did not object at trial to lack of notice or a fatal variance. Therefore, these issues were forfeited and we review the appellant's claims for plain error. *United States v. Finch*, 64 M.J. 118, 121 (C.A.A.F. 2006); *see also United States v. Ahern*, 76 M.J. 194, 197-98 (C.A.A.F. 2017) (distinguishing forfeiture, which is reviewed for plain error, from waiver). On plain error review, an "[a]ppellant has the burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights. The failure to establish any one of the prongs is fatal to a plain error claim." *United States v. Feliciano*, 76 M.J. 237, 240 (C.A.A.F. 2017) (internal citations omitted). Here, we find no error in the government's notice and no fatal variance.

### 1. Proper notice

"The due process principle of fair notice mandates that an accused has a right to know what offense and under what legal theory he will be convicted. . . ." *United States v. Jones*, 68 M.J. 465, 468 (C.A.A.F. 2010) (internal quotation marks and citation omitted). "[T]he Due Process Clause of the Fifth Amendment also does not permit convicting an accused of an offense with which he has not been charged." *United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011).

Prior to trial, in a written response to the appellant's MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 412, MCM, UNITED STATES (2012 ed.) motion, the government informed the defense that the basis for the Specification was the sex in the appellant's bed.[27] Although the defense never requested a bill of particulars, they sought government verification that the Specification was

---

[26] The government had initially charged the appellant with sexual assault for penetrating MH's vulva with his finger in the bed, but the specification was later withdrawn and dismissed prior to trial. *See* Charge Sheet.

[27] Appellate Exhibit (AE) XI at 3, para. n.

based only on the sex that occurred in the bed after MH said "just hold me."[28] On the record, the government "wholeheartedly" agreed this was accurate.[29]

The genesis of this AOE is MH's conflicting and confusing trial testimony regarding the sex on the desk. When she first described the incident, she testified how quickly it had happened and that she did not have time to fully react until she pushed the appellant away after he penetrated her.[30] During cross-examination, she disagreed that she had engaged in sex with the appellant: "we didn't have sex on the desk; it was just penetrating, and then he was pushed off, ma'am."[31] These statements could indicate that she thought the sex was nonconsensual, and this would be consistent with her previous statement to the Naval Criminal Investigative Service.[32] However, in her later testimony on re-direct examination, MH clarified that she did not initially express a lack of consent to the appellant penetrating her on the desk.[33] Finally, in re-cross examination, she described the sex on the desk as consensual, and conceded that she had told the trial counsel and others prior to trial that it was consensual.[34]

It appears from her testimony that emotionally MH did not want the sex on the desk to occur, but she did not make her lack of consent reasonably manifest until she pushed the appellant away *after* the appellant had already penetrated her. This explains why the government and the defense agreed prior to trial that what occurred in the appellant's bed was the only basis for the Specification.

But now the defense alleges that the government impermissibly used the sexual encounter on the desk to pull a bait-and-switch with regard to what misconduct formed the basis of the Specification. We disagree. Long before the trial began, both sides had MH's NCIS statement and were aware of what her testimony would be in this regard, and at trial both sides sought to use

---

[28] Record at 58-59.

[29] *Id.* at 59. We agree with the government that it is unclear from the record whether the parties at this time considered the two penetrative acts in the bed as separate or as one course of conduct. Appellee's Brief of 17 Jan 2018 at 4, n. 2. Evidence at trial seemed to distinguish the "hold me" intercourse from the "condom" intercourse. Regardless, the appellant's AOE alleges lack of notice and fatal variance for what occurred on the desk, not in the bed.

[30] Record at 458.

[31] *Id.* at 499.

[32] *Id.* at 525.

[33] *Id.* at 560.

[34] *Id.* at 526.

this evidence to their advantage. The government used the episode to support their contention that the appellant was single-mindedly determined to satisfy himself sexually, regardless of how many times MH had disengaged from his earlier sexual forays. The defense—who had won a motion to get the evidence admitted—used the incident to explain that what occurred in the bed was just an extenuation of the sexual encounters on the desk and the chair, that the appellant desisted every time MH made her lack of consent manifest, and that this event substantially contributed to the appellant's reasonable mistake of fact as to MH's consent to the sex act in the bed.

In *United States v. Fields*, the appellant claimed a lack of notice when the government presented four different theories of larceny at trial. No. 201100455, 2012 CCA LEXIS 129, at \*9 (N-M. Ct. Crim. App. 12 Apr 2012) (unpub. op.), *rev. denied*, 71 M.J. 380 (C.A.A.F. 2012). In *Fields*, we rejected the appellant's contention that he lacked notice on what he needed to defend against. We held that "notice was readily apparent throughout pretrial discovery and motions litigation. . . . The appellant never requested a bill of particulars nor raised any objection during or after the [g]overnment's case. In addition, he failed to object to the findings instructions and worksheet crafted by the military judge." *Id.* At \*10. So, too, here. The defense's failure to object to statements by the trial counsel, evidence regarding the sex on the desk, and the military judge's instructions—all contradict the appellant's recent contention that he was confused as to what to defend against. The government did not argue that the appellant was guilty of sexually assaulting MH on the desk. The appellant had adequate notice. We find no plain error because the appellant was not misled in any way that prohibited him from adequately preparing for trial.

*2. Fatal variance*

"A variance between pleadings and proof exists when evidence at trial establishes the commission of a criminal offense by the accused, but the proof does not conform strictly with the offense alleged in the charge." *United States v. Lubasky*, 68 M.J. 260, 264 (C.A.A.F. 2010) (citation omitted). A fatal variance is one "that either deprives the defendant of fair notice of the charges or exposes the defendant to the risk of double jeopardy."[35] Here again we find no plain error. In so concluding, we utilize the Court of Appeals for the Armed Forces' material variance test in our plain error analysis.

To prevail on a fatal variance claim, an appellant must show that the variance was (1) material and (2) that it substantially prejudiced him. *Finch*, 64 M.J. at 121. A variance that is "material" is one that substantially changes the nature of the offense, increases the seriousness of the offense, or increas-

---

[35] *Variance*, BLACK'S LAW DICTIONARY (10th ed. 2014).

es the punishment of the offense. *Id.* When applying this two-part test, our superior court has noted that even where there is a variance in fact, the critical question is one of prejudice. *Id.* In other words, (1) has the accused been misled to the extent that he has been unable adequately to prepare for trial; and (2) is the accused fully protected against another prosecution for the same offense. *Id.*

The appellant fails the first prong because he has not shown that there was a material variance. In the appellant's trial, neither the offense nor its elements changed, nor did the members find by exceptions and substitutions. Accordingly, there was no increase in the seriousness of the offense or the authorized punishment for the offense.

The government's opening statement and closing arguments, the evidence produced at trial, and the findings of the members all show that there was no variance, let alone material variance. In the trial counsel's opening statement—after reciting the facts of 5 June 2015—he told the members the appellant was charged with one specification of "sexual assault by bodily harm for what occurred in the rack[36] that evening, after [MH] told him 'just hold me.'"[37] On the merits, the trial counsel only used the incidences on the desk and in the chair to prove lack of consent in the appellant's bed and their surrounding circumstances to prove that any mistake of fact the appellant may have had as to MH's consent to the sexual act in the bed was not reasonable. At no point during the trial did the government attempt to prove that the appellant was guilty of a sexual assault that occurred on the desk. In fact, the government was stuck with MH's conflicting testimony regarding how she viewed the incident. In the closing arguments, the trial counsel emphasized no less than six times that what occurred in the bed was the charged offense.[38] The trial counsel ended his closing argument by summarizing, "The accused sexually assaulted [MH] in his rack on 5 June 2015."[39]

Finally, we reject the appellant's contention that the verdict exposes him to double jeopardy because we cannot be sure that the members convicted him for the occurrence in his bed. In sum, we find no plain error as the appellant was on fair notice of what he had to defend against and there was no fatal variance.

---

[36] "Rack" is a common military term for "bed."

[37] Record at 428.

[38] *Id.* at 663, 665-66, 668, 671, 683-84, 687.

[39] *Id.* at 671.

**C. Admission of M**IL**. R. E**VID**. 412 evidence**

The defense filed a pre-trial motion seeking to admit the sexual encoun-ters on the desk and the chair.[40] The government did not oppose the motion, and agreed that the interaction between the appellant and MH at the field-house was also relevant. The military judge granted the motion. During trial, the government chose to elicit these prior sexual encounters during their direct examination of MH. Unsurprisingly, the defense did not object, and they also cross-examined MH on the instances. But now, on appeal, the appellant asserts that this evidence was inadmissible under M IL. R. E VID. 404(b) and 413.[41] We disagree. We conclude that the military judge did not err in admitting the evidence, and even if he did, in applying the invited error doctrine, we conclude that the appellant is precluded from raising this issue on appeal.

First, we find the military judge did not err in granting the appellant's M IL. R. E VID. 412 motion. This rule provides that "evidence of specific in-stances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent or by the prosecutions" is admissible. M IL. R. E VID. 412 (b)(1)(B). The sexual interactions between MH and the appellant at both the fieldhouse and in his room were highly relevant to show previous consent to sexual activity be-tween the parties and to raise the appellant's mistake of fact defense.

The appellant contends, without citing any authority, that after the mili-tary judge ruled the M IL. R. E VID. 412 evidence admissible, only the appellant held the key to introduce that evidence at trial. This is simply not the case. M IL. R. E VID. 412 is intended to protect the privacy rights of alleged victims of sexual assaults while ensuring an accused's right to a constitutionally-sound

---

[40] *See* AE V; Record at 27. It appears that at the time the defense filed their mo-tion, they did not seek admissibility of what occurred at the fieldhouse. The govern-ment in their response to the motion noted that the specification relating to what had occurred at the fieldhouse had been dismissed. *See* n. 26, *supra*. They conceded that the interaction at the fieldhouse was admissible under M IL. R. E VID. 412, and as evidence of a prior inconsistent statement by MH regarding whether the appellant had penetrated her with his fingers. Regardless, in a motions session, both sides agreed that all of the prior sexual conduct between MH and the appellant was admissible. Record at 27.

[41] M IL. R. E VID. 404(b)(1) is a rule of exclusion to prevent "evidence of a crime, wrong, or other act" to be used "to prove a person's character" and "to show that on a particular occasion the person acted in accordance with the character." M IL. R. E VID. 404(b)(1). M IL. R. E VID. 413 is a rule of inclusion which allows a military judge to "admit evidence that the accused committed any other sexual offense" as defined "[u]nder the Uniform Code of Military Justice . . . federal or state law." M IL. R. E VID. 413.

trial. The rule does not give the government or the defense the exclusive right to decide if, when, and how to present MIL. R. EVID. 412 evidence. Once the military judge ruled that all of the sexual contact between the appellant and MH was admissible, the government was free to address those matters in their direct examination of MH during their case-in-chief. We reject the appellant's contention that the government used the MIL. R. EVID. 412 ruling as license to impermissibly introduce MIL. R. EVID. 404(b) and 413 evidence. In reality, both sides wanted this evidence admitted for their own purposes, and both sides used the evidence in their theories of the case. We also reject the appellant's claim that the military judge erred when he failed to give MIL. R. EVID. 404(b) and 413 instructions to the members for the properly-admitted MIL. R. EVID. 412 evidence.

Even assuming the military judge erred, we would still decline to grant relief based on the invited error doctrine. The propriety of the invited error doctrine is a question of law we review *de novo*. *United States v. Martin*, 75 M.J. 321, 325 (C.A.A.F. 2016). "The invited error doctrine prevents a party from creating error and then taking advantage of a situation of his own making on appeal." *Id.* (citation and internal quotation marks omitted). Here, the appellant sought admission of evidence of prior sexual acts between MH and himself to show consent and mistake of fact. The appellant then used this evidence at trial. It is difficult to find fault in this commonsense trial strategy. But the appellant cannot successfully win admissibility of evidence at trial and then seek to re-characterize that evidence on appeal and argue it should not have been admitted. We decline to grant relief where the appellant attempts to re-classify what was properly admitted evidence at trial into inadmissible MIL. R. EVID. 404(b) and 413 evidence on appeal.

## D. Granting the government's challenge of CDR JT

The appellant avers that the military judge erred in granting the government's challenge of CDR JT for cause. We disagree.

### 1. The facts

During individual voir dire, CDR JT disclosed that she had a good friend, and fellow Academy graduate, who had previously been falsely accused of rape. As part of the investigation CDR JT was interviewed by the Naval Criminal Investigative Service. She felt that the accusation was a personal attack on her friend. After a lengthy trial, CDR JT's good friend's accuser admitted that she had falsely accused him of rape because she "needed someone to blame at the time, [and] he just happened to be in the wrong place at the wrong time."[42]

---

[42] Record at 211.

CDR JT was friends with one of the defense witnesses, CDR DF. They met years ago when they were on the swim team together for two years at the Academy. The two had stayed in contact over the years, and CDR DF had assisted CDR JT navigate the application process to become an instructor at the Academy. However when asked to define their current relationship, CDR JT replied, "[j]ust a distant friend."[43]

Another defense witness, Midshipman W, was then CDR JT's student at the Academy. When CDR JT announced to the class her planned absence due to her being detailed to the court-martial, Midshipman W approached her and said, "Ma'am, . . . I'm a witness."[44] When asked by counsel how well she knew Midshipman W, CDR JT replied, "I know his performance and I know a little bit of his personality, but just in the classroom."[45]

Finally, CDR JT revealed that, prior to the court-martial, she had heard rumors from Academy instructors that a midshipman had fabricated a sexual harassment charge to justify returning late from liberty.

The government challenged CDR JT for cause, and the military judge granted it based on actual bias. The military judge gave three reasons for the grant. First, observing CDR JT's demeanor in court when she answered questions regarding her officer friend who had been falsely accused of rape, the military judge noted that CDR JT appeared

> in terms of her tone and her attitude irritated about the false allegation against her friend, and seemed somewhat firm and annoyed, I guess, that it had even been made, . . . I think that experience may have created some bias against sexual assault allegations on the part of [CDR JT].[46]

Second, the military judge cited the relationship between CDR JT and two of the defense witnesses. The military judge found that the member's close association on the swim team with CDR DF and CDR DF's assistance with CDR JT obtaining a teaching position created actual bias. With respect to Midshipmen W, the military judge felt that CDR JT's relationship with him as his teacher would have the "potential to taint [CDR JT's] evaluation of the evidence."[47]

---

[43] *Id.* at 216.

[44] *Id.* at 220.

[45] *Id.* at 218.

[46] *Id.* at 401-02.

[47] *Id.*

Third, the military judge was concerned with CDR JT's knowledge of rumors at the Academy that possibly implicated the appellant's case. The military judge explained that

> Another very important factor . . . is that [CDR JT] was aware of a rumor concerning this case[] . . . it's something that she knows about and associates with this case, and could introduce an alternative explanation that's outside the scope of facts, and so I believe that because she was considering it as potential in this case, I don't know how we cure that taint.[48]

### 2. Application of the law to the facts

R.C.M. 912(f)(1) states a "member shall be excused for cause whenever it appears that the member . . . [s]hould not sit . . . in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." This rule encompasses both demonstrations of actual bias and implied bias. *United States v. Warden*, 51 M.J. 78, 81 (C.A.A.F. 1999). "A military judge's determinations on the issue of member bias, actual or implied, are based on the totality of the circumstances particular to a case." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012) (citation and internal quotation marks omitted). "The burden of establishing that grounds for a challenge exist is upon the party making the challenge." R.C.M. 912(f)(3). Actual bias exists when a member's bias "is such that it will not yield to the evidence presented and the judge's instructions. Actual bias is reviewed subjectively, through the eyes of the military judge or the court members." *Warden*, 51 M.J. at 81 (citations and internal quotation marks omitted).

Generally, military appellate courts have addressed challenges for cause when those challenges made by the accused at trial have been denied by the military judge. *United States v. James*, 61 M.J. 132, 138 (C.A.A.F. 2005). In the context of challenges brought by the accused, military judges must liberally grant challenges for cause. *Id.* at 139. However, given the convening authority's broad power to appoint court members, the "liberal grant" policy does not apply to ruling on the government's challenges for cause. *Id.* Nevertheless, in evaluating on appeal a military judge's ruling on a government challenge for cause, it is "appropriate to recognize the military judge's superior position to evaluate the demeanor of court members. A military judge's ruling on a challenge for cause [in favor of the government] will therefore not be reversed absent a clear abuse of discretion." *Id.* at 138.

The abuse of discretion standard calls for more than a mere difference of opinion; the challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *United States v. Baker*, 70 M.J. 283, 287 (C.A.A.F.

---

[48] *Id.* at 400-01.

16

2011). Importantly, a military judge receives latitude on his factual determinations of actual bias because he personally observed the member's demeanor. *United States v. Leonard*, 63 M.J. 398, 402 (C.A.A.F. 2006). However, "[a]n abuse of discretion has occurred 'if the military judge's findings of fact are clearly erroneous or if the decision is influenced by an erroneous view of the law.'" *United States v. Dockery*, 76 M.J. 91, 96, (C.A.A.F. 2017) (quoting *United States v. Quintanilla*, 63 M.J. 29, 35 (C.A.A.F. 2006) (citation omitted)).

Applying the abuse of discretion standard for actual bias and giving the military judge's ruling "great deference," *United States v. Miles*, 58 M.J. 192, 195 (C.A.A.F. 2003), we conclude the military judge did not err in granting the challenge for cause of CDR JT for actual bias. His ruling was not arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *Baker*, 70 M.J. at 287. We concur that there was ample evidence to support the military judge's conclusion of CDR JT's actual bias. We agree with the military judge that CDR JT's observable irritation regarding her close friend's false rape allegation is evidence of actual bias against persons alleging sexual assault. We find this alone is reason enough to remove the member from the panel. Furthermore, CDR JT's relationships with two defense witnesses, and her knowledge of rumors that the military judge felt she may confuse with the facts of the case further support her removal from the panel. We conclude the cumulative effect of CDR JT's answers and demeanor established actual bias. Under all the circumstances, allowing CDR JT to remain on the appellant's panel would have created substantial doubt as to the legality, fairness, and impartiality of the court-martial.

Even assuming, *arguendo*, there was an abuse of discretion, the appellant would need to demonstrate that he suffered actual prejudice from CDR JT's exclusion from the panel. *See United States v. Dockery*, 76 M.J. 91, 97-98 (C.A.A.F. 2017). The appellant argues that he was prejudiced because the number of persons on the panel was impermissibly reduced by the granted challenge for cause of CDR JT, and because the government failed to state a gender-neutral basis for excluding CDR JT. We summarily reject both arguments. *See United States v. Newsom*, 29 M.J. 17, 21 (C.M.A. 1989) (rejecting the notion that a different mix of members would have produced more favorable results for the appellant); *United States v. Elliott*, 89 F.3d 1360, 1364-65 (8th Cir. 1996) (*Batson v. Kentucky*, 476 U.S. 79, 89 (1986) applies only to peremptory challenges, not challenges for cause). The appellant fails to show any actual prejudice. This AOE is without merit.

### III. Conclusion

The findings and the sentence as approved by the CA are affirmed.

Chief Judge WOODARD concurs.

17

Senior Judge FULTON, dissenting:

The record does not convince me beyond a reasonable doubt that MH did not consent to sex, or that the appellant did not reasonably think that MH consented. I would disapprove the findings.

The record shows that MH, a first class midshipman at the United States Naval Academy, was an unreliable relator of relevant facts. MH originally told NCIS that the appellant had sexually assaulted her in the fieldhouse by penetrating her vagina with his finger. At trial, she said that the appellant touched her over her shorts while they were practicing ju-jitsu, and that she consented to this. ("[T]hat was fine for a second. I was prepared to do that . . .").[1]

MH was also inconsistent about whether the sex on the desk was consensual. She acknowledged telling NCIS that the sex on the desk was nonconsensual. But she also acknowledged telling trial counsel, in the presence of two others, that the sex on the desk was consensual:

> Defense counsel: And you told the group that sex on the desk was consensual.
>
> MH: I believe so, ma'am.
>
> DC: So you told NCIS that it was nonconsensual.
>
> MH: Yes, ma'am.
>
> DC: But you testified in court that it was consensual.
>
> MH: Yes, ma'am.[2]

Even where MH's testimony was consistent, it tended to show ambivalence about engaging in sex with the appellant. MH was uncomfortable while having sex on the desk, so she pushed the appellant away. The two discussed her discomfort. Part of MH's discomfort stemmed from her feeling that she and the appellant were not having "an intimate connection."[3] She also said that she "didn't have any control of the situation."[4] The appellant's suggested solution was to have sex with MH on top. The appellant sat in a chair, and MH straddled the him. After having sex in this position for a while MH decided that she was still uncomfortable and got off the appellant. This sex

---

[1] Record at 449.

[2] *Id.* at 526.

[3] *Id.* at 459.

[4] *Id.*

was indisputably consensual, and the appellant stopped having sex with her when she indicated that she no longer consented.

After the appellant's roommate left, the appellant joined MH, who was already in his bed. The appellant put MH's clothes in the bed, but MH did not get dressed. Instead, she asked the appellant to hold her. MH was nude from the waist down, except for socks. The appellant held her for a while and then began to have sex with MH. MH did not express her lack of consent.

The reason MH gave for not saying no was that she had already made it clear that she did not want to have sex, but that "[a]t this point, it didn't seem like what [she] said mattered."[5] But she had in fact expressed her lack of consent twice mid-coitus in the moments leading up to the offense. On both occasions the appellant stopped having sex with her.

The majority gives considerable weight to the fact that MH told the appellant that she wanted an emotional connection with a partner before she had sex with him—that she "didn't want to be f****d because [she] felt as though . . . [she] still wasn't getting . . . that intimate connection . . . ."[6] True, MH said that she wanted more from a sexual relationship than feeling "like [she] was just there to please him . . . [.]"[7] In my view the majority's reliance on this evidence confuses what MH wanted with what she consented to: MH wanted an emotional connection with a prospective sexual partner. But she consented—at least once and perhaps twice—to sex with the appellant in the moments leading up to the alleged offense. It is not unreasonable to suppose that she consented a second or third time while she lay naked with the appellant in his bed. Nor is it unreasonable to think that the appellant would have thought that she was consenting again, particularly since MH had proved capable of refusing sex in a way he understood.

Because the record leaves me unconvinced that MH did not consent to sex with the appellant, or that the appellant did not reasonably believe that she consented, I would find disapprove the findings. I respectfully dissent.

FOR THE COURT

RODGER A. DREW, JR.
Clerk of Court

---

[5] *Id.* at 549.

[6] *Id.* at 461.

[7] *Id.*