# United States Navy-Marine Corps Court of Criminal Appeals

_____

## UNITED STATES
*Appellant*

v.

## Nicholas S. GITTO
## Lance Corporal (E-3), U.S. Marine Corps
*Appellee*

_____

## No. 201800164
_____

Appeal by the United States Pursuant to Article 62, UCMJ.

*Military Judges:* Colonel Peter Rubin, USMC (arraignment);
Lieutenant Colonel Emily Jackson-Hall, USMC (trial).

*Arraignment:* 22 February 2018 by a general court-martial convened
at Marine Corps Air Station Cherry Point, North Carolina.

_____

*Decided:* 8 January 2019

_____

*For Appellant:* Lieutenant Kimberly Rios, JAGC, USN;
Captain Brian Farrell, USMC.

*For Appellee:* Captain Nicholas Mote, USMC.

_____

**This opinion does not serve as binding precedent but
may be cited as persuasive authority under
NMCCA Rule of Practice and Procedure 30.2.**

_____

Before HUTCHISON, TANG, and LAWRENCE,
*Appellate Military Judges*

TANG, Judge:

This is an interlocutory appeal taken by the government under Article 62, Uniform Code of Military Justice (UCMJ).[1] Following a pretrial hearing, the military judge granted a defense motion to suppress all evidence resulting from a search of the appellee's cell phone. In a supplemental ruling, the military judge ruled all derivative evidence was also excluded. We are asked to decide if we have jurisdiction over this appeal and, if so, whether the military judge abused her discretion by suppressing this evidence. We conclude that we have jurisdiction to hear this appeal and that the military judge abused her discretion. We therefore grant the government's appeal.

## I. BACKGROUND

The appellee voluntarily met with agents of the Naval Criminal Investigative Service (NCIS) to report a crime. He presented as a crime victim, complaining he was being extorted by Lance Corporal (LCpl) JV, a former sexual partner. In support of his allegation, he consented to a search of his cell phone. That search yielded text messages, totally unrelated to his relationship with LCpl JV, which the appellee exchanged with a 14-year-old girl, CM. Now suspecting the appellee of offenses relating to CM, NCIS agents interviewed CM, who stated she had a sexual relationship with the appellee and that they exchanged sexually explicit photographs. The appellee is now charged, at a general court-martial, with three specifications under Article 120b, UCMJ, 10 U.S.C. § 920b, and two specifications under Article 134, UCMJ, 10 U.S.C. § 934, alleging that he sexually abused CM. The trial defense counsel moved the court to suppress all evidence derived from the search of the appellee's cell phone, "including the investigation into C.M. and [the appellee's] statements to NCIS."[2] The court held an Article 39(a), UCMJ, session and ultimately granted the defense motion to suppress all evidence derived from the search of the appellee's cell phone. The government timely appealed the military judge's ruling to this court.

---

[1] 10 U.S.C. § 862 (2016).

[2] Appellate Exhibit (AE) VI at 22 (Defense Motion to Suppress Evidence of 30 March 2018).

**A. The appellee's three interviews with NCIS agents and consent to search his phone[3]**

The appellee met LCpl JV in the fall of 2016. He had sex with LCpl JV in his barracks room on 12 November 2016. Both the appellee and LCpl JV were drinking with a group of friends off base earlier that day before returning to the appellee's barracks room, where LCpl JV stayed the night. The appellee contends the sex was consensual. However, LCpl JV "stormed out" of the room the following morning and claimed the appellee sexually assaulted her.[4]

But LCpl JV did not make a report of sexual assault. Rather, she demanded money and valuable items from the appellee in exchange for refraining from making a sexual assault complaint against him. The appellee and LCpl JV discussed the extortionate arrangement via text message and in person. According to the appellee, in spite of the extortion and lingering sexual assault allegation, he continued a friendly consensual sexual relationship with LCpl JV. He said she would "teasingly" send him photos.[5] Although they agreed on a sum of $2,000, the appellee did not pay it. When LCpl JV made a veiled threat to report the alleged sexual assault to the appellee's chain of command, the appellee appealed to them first. He provided them screen shots of text messages he exchanged with LCpl JV. The appellee's chain of command forwarded the evidence to NCIS. The appellee had no further contact with LCpl JV.

The appellee met NCIS Special Agents M and H on 18 January 2017. Because the agents knew the complaint of alleged extortion involved an allegation of sexual assault, they read the appellee his rights under Article 31(b), UCMJ, for suspicion of sexual assault. The appellee waived his rights and consented to an interview, in which he relayed the facts detailed above. He also noted that LCpl JV accused him of wrongfully taking photographs of her body. He stated he had screenshots saved on his phone depicting Snapchat messages he received from LCpl JV. He provided the names of witnesses he told about the alleged extortion and who were present with the appellee and LCpl JV on liberty before the alleged sexual assault.

After solidifying the details of the appellee's account, Special Agent M told the appellee that the screenshots the appellee provided were "helpful," but that he needed "everything" from the appellee's phone.[6] Special Agent M told

---

[3] The appellee's 18 January 2017 encounter with NCIS agents was video recorded; a transcript of this interview is appended to the record as AE XVI.

[4] AE XVI at 10.

[5] *Id.* at 12.

[6] *Id.* at 23.

the appellee there were apparent gaps in the text messages and that he needed the metadata from the messages and any pertinent images. Special Agent M told the appellee he could provide a permissive authorization for search and seizure to allow Special Agent M to "take [his] cell phone and basically take all the data off of it."[7] Special Agent M stated, in the alternative, he would pursue a command authorization for search and seizure to search the appellee's phone, but that he would have to "take" (seize) the phone that day in either event.[8] Special Agent M further stated it was "fine" if the appellee did not consent to a search, requiring Special Agent M to pursue a command authorization, and that he wouldn't view such refusal as a sign of guilt.[9]

Special Agent M described the breadth of the search he intended to conduct. He described how he would hook the phone up to a forensic device and "dump everything on the phone," yielding "all the data," and "all [of the appellee's] text messages including those ones with her"—referring to LCpl JV.[10] When Special Agent M asked if he would consent to a search, the appellee stated, "I just have like . . . other . . . personal stuff on there."[11] Special Agent M responded that he would "have to take all [his] data because [he] can't pick and choose," but he reassured the appellee he would not report "embarrassing" non-criminal details to the appellee's command.[12]

Special Agent H, who was less active during the interview of the appellee, further expounded on Special Agent M's comments. He said, when looking through the cell phone, they will be "looking for stuff pertaining to this investigation," but he gave a specific caveat that if they were to find a "film on [his] phone of [the appellee] killing some dude," they would have to investigate that offense.[13] Special Agent M added another caveat, stating the agents would have to investigate if they found any child pornography on the appellee's phone.

---

[7] *Id.* at 24.

[8] *Id.* at 25.

[9] *Id.*

[10] *Id.* at 24.

[11] *Id.* at 25.

[12] *Id.* SA BM specifically referenced having no interest in photos of the appellee's penis, if any might be saved on the phone, or photos of a woman's breasts, if any were found.

[13] *Id.* at 27-28.

After the appellee stated he would consent to the search, he asked how long he would be without a phone because it was his sole form of communication with his family. The agents stated they could not provide a specific time estimate, and the appellee accepted this response. Then the appellee signed a written consent form, entitled "Permissive Authorization for Search and Seizure."

The form was pre-printed, with certain blocks hand-filled. It was dated 18 January 2017 and stated, in pertinent part:

> I, *Nicholas Gitto*, after being advised by Special Agent(s) [*M and H*] that the Naval Criminal Investigative Service is conducting an investigation concerning: *sexual assault and extortion* have been requested to permit a search of: *Iphone 7* [with PIN code and unique identifier listed] . . . .

> This search and seizure may be conducted on *18Jan17* and for as many subsequent days as are necessary to complete the computer forensic examination of all electronic storage media found during the search by Special Agent(s) [*M*] and any other NCIS Special Agents as may be necessary. . . .

> I also give permission to any NCIS Special Agent(s)/ Investigative Computer Specialist(s) to conduct computer forensic reviews and examinations of all electronic storage media and data files, to include text and graphical image files, contained on the electronic storage media contained in or attached to the described seized equipment (such as . . . flash memory media or other devices) for investigative purposes pursuant to the investigation listed above.[14]

The appellee placed his initials before and after each substantive paragraph and signed the document. In additional to permitting the appellee to review the consent form, Special Agent M read the text of the consent form aloud. The appellee verbally confirmed that the agents neither threatened him nor made any promises.

After the appellee reported LCpl JV for extortion and signed the consent form, NCIS agents interviewed LCpl JV. LCpl JV alleged that the appellee had, in fact, sexually assaulted her. As a result, NCIS agents interviewed the appellee again on 8 February 2017 in relation to LCpl JV's allegation of sexual assault. The appellee again signed a consent form authorizing a search of

---

[14] AE VIII at 18 (italicized text indicates information hand-written in original document).

his cell phone, which was already in NCIS custody, for evidence relating to the alleged sexual assault of LCpl JV. This pre-printed consent form was identical to the consent form the appellee signed on 18 January 2017. When hand-filled, it granted NCIS agents and "lab personnel" permission to search the appellee's iPhone 7, according to the same terms recited above, pertaining to "an investigation concerning the *sexual assault of [LCpl JV].*"[15]

Other NCIS agents interviewed the appellee a third time on 20 June 2017 to investigate his relationship with CM. By then, the appellee had procured a new cell phone, an iPhone 5. Although the agents had obtained a command authorization for search and seizure to justify search of this new phone, the appellee provided consent to search his iPhone 5. The appellee never revoked consent to search either of his two seized cell phones until his defense counsel served a notice of representation on 11 December 2017.

## B. Testimony and Evidence Presented During the Article 39(a), UCMJ, Motion Hearing

Special Agent M testified regarding his search of the appellee's cell phone.[16] He stated he used a Cellebrite device to extract the data from the appellee's cell phone into a 33,000 plus page, keyword-searchable Adobe Acrobat file (PDF). Once he extracted the data, he searched the Cellebrite PDF Data Extraction Report (the Cellebrite report) and did not search the phone itself. The Cellebrite report was arranged by type of data, from different applications on the cell phone, and by contact.

Special Agent M used LCpl JV's name and phone number to keyword search the Cellebrite report to find messages pertaining to LCpl JV or exchanged with LCpl JV. He reviewed all text conversations found using those keyword searches before he interviewed LCpl JV on the very next day, 19 January 2017.[17]

On 27 February 2017, while the extortion and sexual assault investigations were still ongoing, Special Agent M resumed his review of the Cellebrite report, intending to review it from the first page to the last. Although he had performed keyword searches prior to interviewing LCpl JV on 19 January

---

[15] *Id.* at 30 (italicized text indicates information hand-written in original document). The second consent form contained the same PIN and unique identifier for the appellee's iPhone 7.

[16] All references to the appellee's cell phone pertain to the original cell phone the appellee surrendered on 18 January 2017.

[17] As a result of this investigation LCpl JV was convicted at summary court-martial for extortion.

2017, Special Agent M testified he believed he had to conduct a thorough search for "anything else that was relevant to [his] investigation" by "skimming" the entire Cellebrite report.[18] He stated he was looking for "anything related to the extortion or the sexual assault investigation."[19] He testified he conducted a top-down review of the report because he otherwise "wouldn't know . . . if [his] keyword searches were, in fact" yielding all of the evidence.[20] When asked about the limitations of conducting keyword searches alone, Special Agent M stated that a more thorough review might yield evidence the appellee confided in others about what happened with LCpl JV.

About one quarter to one third of the way through the Cellebrite report, Special Agent M encountered the appellee's text messages with CM.[21] The section of the Cellebrite report containing the appellee's text conversation with CM was appended to the record as an enclosure to the government's response motion.[22] The first page is set off by a header, in the form of a black bar containing the title "Extraction Report, Apple iPhone Logical." A list of conversation "[p]articipants" appears below the black bar, listing appellee's cell phone number, CM's cell phone number identified by her contact name, the appellee's email address, and an additional cell phone number that was used to text CM only twice, in the last two messages. The text conversation is preceded by a notation, "Conversation – Instant Messages (1424)." The conversation is printed immediately below, beginning with CM's first text to the appellee on 30 July 2015, and continuing without interruption by additional headers or breaks for a total of 97 pages. The last text message on the last page is dated 29 May 2016.

Special Agent M testified he initially read through the entire exchange between the appellee and CM, believing CM was a fake persona who may also be "sextorting" the appellee.[23] In order to confirm or disprove this suspicion, Special Agent M contacted the high school he believed was referenced in

---

[18] Record at 32.

[19] *Id.*

[20] *Id.*

[21] These were framed as "iMessages," but the exact nature of the message is not important for this opinion. For simplicity, we will refer to the messages as "text messages."

[22] AE VIII at 31-129.

[23] Special Agent M described "sextortion" as a scheme by which an individual would pose as a child, engage in sexual chats with a target and exchange explicit images, then a person posing as the child's parent or guardian would extort money from the target.

the conversation. Upon contacting the high school security officer, Special Agent M learned CM was a real child. Special Agent M then ceased further review of the report and sought and received a command authorization for search and seizure pertaining to alleged sexual abuse of a child and child pornography. When Special Agent M resumed his review of the cell phone data, he found no further evidence pertaining to CM. All evidence relating to CM was contained in the exchange Special Agent M had already reviewed. Prior to contact by NCIS, CM never reported her sexual relationship with the appellee to law enforcement, though she once told an adult caretaker about the relationship.

On cross-examination, Special Agent M agreed he knew the start and end dates of the appellee's relationship with LCpl JV, and he had the messages provided by the appellee, LCpl JV's name, and number.

## C. The Military Judge's Ruling

The military judge granted the defense motion to suppress all evidence derived from the appellee's cell phone.[24] She ruled that the second consent form—not the first consent form—governed Special Agent M's more thorough search of the appellee's cell phone.[25] She concluded that Special Agent M exceeded the scope of the second consent form by looking for evidence of extortion, and that he was not searching in a permissible portion of the report when he encountered the appellee's text conversation with CM, removing it from the plain view doctrine.[26] Accordingly, she suppressed all evidence from the search of the appellee's cell phone, including "the cell phone search results pertaining to C.M. and all evidence derived therefrom."[27]

---

[24] AE XVII (Court's Essential Findings, Conclusions of Law and Ruling of 15 May 2018). The defense motion requested suppression of all evidence derived from the search of the appellee's cell phone, "including the investigation into C.M. and [the appellee's] statements to NCIS." AE VI at 2. The military judge granted the defense motion in full. Upon request for clarification by the trial counsel, the military judge issued a supplemental ruling stating "[t]he court has suppressed all evidence pertaining to the cell phone search results pertaining to CM and all evidence derived therefrom." AE XVIII (Supplement to Court's Essential Findings, Conclusions of Law and Ruling of 17 May 2018).

[25] AE XVII at 6.

[26] *Id.* at 7.

[27] AE XVIII.

## II. DISCUSSION

### A. Scope of Review and Jurisdiction

In cases over which a military judge presides and a punitive discharge can be adjudged, Article 62, UCMJ, gives us jurisdiction over government appeals of a military judge's ruling excluding evidence that is substantial proof of a fact material in the proceeding.[28] Our jurisdiction is narrowly circumscribed, and we construe this jurisdictional grant strictly. *Clinton v. Goldsmith*, 526 U.S. 529, 535 (1999). Because our jurisdiction only extends to the evidence described in Article 62, UCMJ, we must determine what evidence has been excluded by the military judge and whether that evidence is substantial proof of a fact material in the proceeding. *See United States v. Jacobsen*, 77 M.J. 81, 86 (C.A.A.F. 2017).

The military judge excluded evidence. We find the suppressed evidence–the messages from the appellee's cell phone and "the investigation into CM"–constitute substantial proof of a material fact.[29] The search of the appellee's cell phone yielded the entire text message correspondence between the appellee and CM, documenting the timeline and evolution of the appellee's relationship with CM. The messages provide both substantive and circumstantial evidence of the appellee's guilt. They form the basis of Charge I, Specification 1, alleging the appellee wrongfully communicated indecent language to a minor. The messages also show the appellee knew CM's young age and they strongly corroborate his intention to have sex with CM. As a result of these text messages, Special Agent M confirmed CM's identity and age by contacting her school. Through the point of contact with CM's school, the agent arranged an interview with CM, who agreed to cooperate with NCIS. When NCIS agents confronted the appellee, he admitted he had a sexual relationship with CM. He provided consent to search his new iPhone 5, on which further incriminating evidence was found. Therefore the suppressed evidence

---

[28] 10 U.S.C. § 862(a)(1)(B) (2016).

[29] Neither the military judge's ruling nor her supplemental ruling addresses the specific types of evidence she deemed to be derivative of the initial search, nor did the military judge provide a written analysis of why the derivative evidence was tainted by the initial illegality. The parties also did not litigate which specific aspects of "the investigation into CM" should be suppressed. But given the broad nature of her ruling, granting the defense motion in full, we read the military judge's suppression ruling as including CM's testimony at trial, the appellee's statements to NCIS agents admitting his sexual relationship with CM, evidence gained from the search of the appellee's new iPhone 5, and any other evidence pertaining to CM.

constitutes substantial proof of material facts, and this court has jurisdiction to review the military judge's ruling.[30]

## B. Standard of Review on Appeal

In this appeal we may act only with respect to matters of law. Art. 62(b), UCMJ; RULE FOR COURTS-MARTIAL 908(c)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). We are bound by the military judge's factual determinations unless they are unsupported by the record or clearly erroneous, and may not find facts in addition to those found by the military judge. *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004). We review a military judge's ruling on a motion to suppress for abuse of discretion. *United States v. Baker*, 70 M.J. 283, 287 (C.A.A.F. 2011) (quoting *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004)). In reviewing a military judge's ruling on a motion to suppress, we review fact-finding under the clearly-erroneous standard and conclusions of law under a *de novo* standard. *Baker*, 70 M.J. at 287 (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). The abuse of discretion standard calls "for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *Baker*, 70 M.J. at 287 (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)).

Applying this standard of review, we reverse the military judge's ruling, for the reasons outlined below.

## C. Consent to Search and The Plain View Doctrine

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. A warrantless search is "per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Voluntary consent to search is one exception to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973).

A person giving consent to search may limit his consent by placing limitations on "time, place, or property." MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 314(e)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). A person may also limit the scope of the search. However, the onus is on the appellee to expressly limit the scope of his consent. Limitations will not be

---

[30] Even if the military judge's ruling extended only to the messages recovered from the appellee's cell phone, we still find the suppressed evidence constitutes substantial proof of a material fact, for the reasons described above.

inferred, and the appellee's subjective intent does not control. *See United States v. Wallace,* 66 M.J. 5, 8 (C.A.A.F. 2008).

"The scope of a search is generally defined by its expressed object." *Florida v. Jimeno,* 500 U.S. 248, 251 (1991) (internal quotations and citations omitted). The scope of consent is determined by "objective reasonableness," asking "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (internal quotations and citations omitted).

A person may withdraw consent "at any time." MIL. R. EVID. 314(e)(2). However, the law enforcement official is "entitled to clear notice that this consent has been withdrawn." *United States v. Stoecker,* 17 M.J. 158, 162 (C.M.A. 1984).

While conducting searches authorized by warrant or as permitted by an exception to the warrant requirement, law enforcement agents may discover evidence of additional illegality. The plain view doctrine permits "[l]aw enforcement officials conducting a lawful search [to] seize items in plain view if '[the officials] are acting within the scope of their authority, and . . . they have probable cause to believe the item is contraband or evidence of a crime.'" *United States v. McMahon,* 58 M.J. 362, 367 (C.A.A.F. 2003) (quoting *United States v. Fogg,* 52 M.J. 144, 149 (C.A.A.F. 1999)).

**D. Errors in Military Judge's Ruling**

*1. Erroneous finding of fact*

With one exception, the military judge's findings of fact are not clearly erroneous. The following portion of finding of fact (v) is clearly erroneous. The military judge found that:

> Special Agent [M] testified that the data as extracted from the cell phone by Cellebrite indicates the participant name and/or number, and the "last activity date. [*sic*] This "last activity" indicates when the conversation between the owner of the cell phone and the participant *ended.*[31]

This finding of fact is important because the presence or absence of an automatically generated "last activity date" is a substantial factor in assessing the reasonableness of Special Agent M's search. If each text message conversation listed such a date in its header, Special Agent M could immediately discern whether the conversation might contain information relating to the

---

[31] AE XVII at 3 (emphasis in original).

appellee's relationship with LCpl JV. But the absence of such information would prohibit such quick analysis.

This finding of fact can only be based on Special Agent M's testimony on cross-examination. Trial defense counsel questioned Special Agent M about the information contained in the Cellebrite report. He asked Special Agent M whether there was a field that specifically identified when a text message conversation ended, asking about a "citation that says start and end." But Special Agent M never testified that there was a "last activity date" or end date listed in the Cellebrite report.[32] We have carefully reviewed Special Agent M's testimony and do not find his testimony supports the finding of fact as phrased by the military judge.

More importantly, even if Special Agent M's testimony could be interpreted as stating the Cellebrite report indicated a "last activity date," such a conclusion is clearly unsupported by the record. The military judge had the Cellebrite report available for review. The pertinent section of the Cellebrite report, containing the appellee's text conversation with CM, does not contain any "last activity date" or citation to the conversation end date.[33] Therefore, the military judge's factual finding was clearly erroneous and contradicted by the record.

*2. Conclusions of law*

a. Second consent form

Without any citation to authority, supporting findings of fact, or analysis, the military judge inexplicably ruled that it was the second consent "form which control[led]" Special Agent M's more thorough search of the appellee's cell phone.[34]

The military judge did not make any factual findings that the appellee limited the scope of his first consent by imposing a time limit by which the search must be completed. Nor did the first consent form place a time limit on the completion of the search. To the contrary, the first consent form stated the search could be conducted on 18 January 2017 and "for as many subse-

---

[32] See Record at 35-36.

[33] AE VIII at 31-129. We note that the date of the appellee's last activity with CM was *discernible* from the data contained in the Cellebrite report. But Special Agent M could only determine that date by manually scrolling through to the end of the conversation and then noting the date of the last text message sent or received.

[34] AE XVII at 6.

quent days as are necessary" to complete the investigation.[35] Therefore the appellee's first consent form was not rendered ineffective as there was no lapse in the time allowed by the broad consent of the appellee for NCIS to complete the search.

The military judge also made no finding which suggests the appellee modified or revoked the consent he gave in his first consent form. While talking to NCIS agents a second time, on 8 February 2017, the appellee had an opportunity to revoke or readdress the conditions of his consent to search his cell phone. Revocation requires "clear notice." *Stoecker,* 17 M.J. at 162. There is no evidence the appellee gave any notice—much less clear notice—of any change to his prior consent. Instead, he signed a second consent form, essentially identical to the first, allowing the search of the same phone he already voluntarily turned over to NCIS.

Nor was the authority granted by the appellee's first consent form cancelled or exhausted merely because Special Agent M conducted a limited review of the Cellebrite report before he interviewed LCpl JV on 19 January 2017. Additionally, consent to search was not automatically "terminated merely by a worsening of the consenting party's position," such as by an arrest, or in the appellee's case, the fact that he was being interviewed as a potential suspect vice a complaining witness. Wayne R. LaFave, 4 SEARCH AND SEIZURE § 8.1(c) at 631 (4th ed. 2004) (cited in *United States v. Mendez,* 431 F.3d 420, 427 (5th Cir. 2005).

We find no legal basis to hold the first consent form was rescinded, cancelled, or otherwise rendered ineffective. Accordingly, conducting our *de novo* review, we find the military judge's conclusion that the second consent form controlled was incorrect. Both the first and second consent forms were legally operative and permitted Special Agent M's search of the appellee's cell phone.

### b. Scope of search

Having erroneously held that the second consent form *alone* controlled Special Agent M's search, the military judge went on to conclude that Special Agent M exceeded the scope of the appellee's consent.[36] This conclusion ignored the breadth of consent the appellee gave Special Agent M, when Special Agent M had clearly communicated his intention to take "all the data" and conduct a thorough search. Instead, this conclusion imposed a strict temporal limitation that the appellee himself did not impose. Additionally, this conclusion relied on her erroneous finding of fact, and it did not take into ac-

---

[35] AE VIII at 18.

[36] AE XVII at 6, 8.

count the limitations on Special Agent M's ability to review a single, disjointed 33,000 plus page PDF document.

**E. De Novo Review**

The military judge held Special Agent M was not permitted to read the appellee's text messages with CM, "removing himself from the plain view doctrine."[37] We review this conclusion of law *de novo* and, for the reasons described below, we disagree. *Baker*, 70 M.J. at 287.

We first assess the scope of the appellee's consent to search his cell phone, as this scope will determine whether Special Agent M was acting within his authority when he encountered the appellee's text messages with CM.

*1. Scope of consent to search*

As we held above, both the first and second consent forms were legally operative and governed Special Agent M's search. The second consent form did nothing to modify the first—it merely provided an additional legal authority to search the appellee's cell phone.[38] In providing consent to search on the first occasion, on 18 January 2017, the appellee consented to a broad search of his cell phone.

---

[37] We also find the military judge misapplied the law when she cited *United States v. Tienter,* 2014 CCA LEXIS 700 (N-M. Ct. Crim. App. 23 Sep 2014) (unpub. op.), in support of her conclusion that Special Agent M's search exceeded the scope of the appellee's consent. *Tienter* is factually distinguishable and does not control the outcome in this case. In *Tienter,* this court denied a government appeal challenging a military judge's ruling that suppressed evidence from LCpl Tienter's cell phone. Law enforcement agents had a warrant permitting a search of LCpl Tienter's phone for evidence of drug use. During their initial search they found no evidence. Later, long after the search warrant's expiration date, they used keyword searches of the Cellebrite report to find evidence of sexual assault. *Tienter,* 2014 CCA LEXIS 700 at *4, *11-12. This court rejected the United States' argument that the newly-found evidence was covered by the plain view doctrine merely because it could theoretically have been found—but was not found—during the initial, permissible review of the Cellebrite report. *Id.*

[38] The first consent form lists "extortion and sexual assault" as the subject of the investigation, whereas the second consent form lists the subject as "the sexual assault of [LCpl JV]." Because the extortion allegation was inextricably linked to the sexual assault allegation, the universe of facts relevant to the alleged sexual assault would also be relevant to an extortion attempt based on a promise not to report that same alleged sexual assault.

In describing his intended search, Special Agent M told the appellee he would "dump everything on the phone" and take "all the data."[39] He said he would "get pretty much all [the appellee's] text messages," including the messages to LCpl JV.[40] Special Agent M and Special Agent H said they would review the appellee's photographs, the metadata on those photographs, videos, and text messages. The agents told the appellee they would be "looking for stuff in this investigation" or "pertaining to this investigation."[41] But they also made a distinction between what they would *review* and what they would "report up," or include in their investigative report.[42] When the appellee expressed a concern that he had "personal stuff," on his phone, the agents assumed he was referring to "sexting."[43] They explained that if they encountered any sexually explicit photos of the appellee or adult women, they would "report up" that information to the appellee's upper chain of command, although they would not likely include the photographs themselves.[44] And they specifically warned the appellee they would have to investigate further if they found evidence of child pornography or murder.

Based on the entire exchange between the agents and the appellee, a reasonable observer would expect Special Agent M to extract all the cell phone data and to search the entire report looking for evidence of the appellee's relationship with LCpl JV and any facts relating to extortion or alleged sexual assault involving LCpl JV. A reasonable observer would not expect Special Agent M to conduct his search with laser-like precision, as Special Agent M explained the Cellebrite technology was limited to extracting "all the data." Moreover, a reasonable observer would find the appellee was well aware the agents intended to encounter evidence that *did not* relate to LCpl JV at all, since they specifically discussed how they would treat any embarrassing sexual texts or photos. And the reasonable observer would expect Special Agent M to investigate any new-discovered illegality—especially child sex offenses—as he warned he would do.

Although the first consent form was subject-limited, listing "extortion and sexual assault" as the topic of the investigation, a reasonable observer would

---

[39] AE XVI at 24.

[40] *Id.*

[41] *Id.* at 27-28.

[42] *Id.* at 26.

[43] *Id.* at 25.

[44] *Id.* at 26.

interpret that consent form in light of Special Agent M's explanation of the breadth of the search he intended to conduct.

### 2. Responsive evidence

We next examine what kind of evidence for which Special Agent M was permitted to search. We find Special Agent M could reasonably search for evidence including, but not limited to: (1) witnesses who saw the appellee or LCpl JV on the night of the alleged sexual assault; (2) witnesses who observed the appellee's interactions with LCpl JV or who knew of their relationship, before and after the alleged assault; (3) photos of screenshots the appellee said he took of Snapchat messages from LCpl JV; (4) any explicit photos the appellee says LCpl JV sent him after the alleged sexual assault; (5) evidence the appellee secretly photographed LCpl JV's body, as she claimed; and (6) any statements the appellee made to anyone else about his relationship or interactions with LCpl JV.[45] Such evidence would be relevant to the extortion and sexual assault allegation and would be found in the appellee's photos or text messages with not only LCpl JV, but also with others. This evidence could be inculpatory or exculpatory.

Although much of this evidence would necessarily have been generated after the appellee met LCpl JV, we decline to hold that Special Agent M could only search for messages that post-dated the appellee's first contact with LCpl JV. Some pertinent evidence could pre-date their first contact, such as a request by the appellee to be introduced to LCpl JV, and Special Agent M could search for that evidence, within reason. "As always under the Fourth Amendment, the standard is reasonableness." *United States v. Richards,* 76 M.J. 365, 369 (C.A.A.F. 2017) (quoting *United States v. Hill,* 459 F.3d 966, 974-77 (9th Cir. 2006)).

Having determined the scope of the search permitted by the appellee's consent forms, we next examine Special Agent M's search process to determine whether his search fell within that scope.

### 3. Reasonableness of Special Agent M's search process

Under the facts of this case, Special Agent M had a 33,000 plus page PDF document that contained, as the trial defense counsel characterized it, an "overwhelm[ing]," amount of data.[46] The Cellebrite report contained Facebook

---

[45] This is exactly what Special Agent M said he was looking for while scrolling through the appellee's texts with CM. Special Agent M testified he "didn't know if [the appellee] confided in anyone else or in her [referring to CM], you know, what was going on with [LCpl JV]." Record at 33.

[46] Record at 28.

data, contacts, calendar events, and text messages, and those different types of data were further arranged by contact.[47] Given the layout of the Cellebrite report, Special Agent M could not be sure all evidence relating to LCpl JV would be in the same place. The section headers were not dispositive guideposts by which Special Agent M could limit his search. There was no method to automatically skip to the next conversation section if a particular section was deemed irrelevant and no way to determine the end date without scrolling to the end of a conversation.[48]

The appellee argues Special Agent M had to stop after he used keyword searches for LCpl JV's name and phone number, and he suggests it was possible for Special Agent M to strictly constrain his search to a specific time period.[49] He argues it was improper for Special Agent M to review the Cellebrite report by scrolling through it. We disagree.

We first address the viability of searching the Cellebrite report solely using keyword searches. Although keyword searches might yield the most immediate and obvious search results, Special Agent M was not required to stop there. In searching for evidence to prove or disprove allegations of extortion and sexual assault, it was reasonable for Special Agent M to be more thorough. Our superior court has found "considerable support in federal law" for the "notion of achieving a balance by not overly restricting the ability to search electronic devices," and noted "the dangers of too narrowly limiting where investigators can go." *Richards,* 76 M.J. at 369-70.[50]

A keyword search using only LCpl JV's name would not yield responsive messages if, for instance, the appellee used a nickname for LCpl JV, misspelled or abbreviated her name, or referred to her in a generic sense. A keyword search would not necessarily uncover any messages showing there were additional witnesses unknown to investigators, whose names were not provided by the appellee or LCpl JV.

---

[47] *Id.*

[48] Although we have a 97-page printout available for review, as did the military judge, we are mindful that Special Agent M was reviewing the entire 33,000 plus page PDF document electronically, from top to bottom, without knowing when a particular section would end and another would begin.

[49] Appellee's Brief at 18.

[50] Although in *Richards,* the CAAF was reviewing the propriety of a command authorization for search and seizure against the Fourth Amendment's "particularity requirement," we find the case applicable to assess the reasonableness of Special Agent M's search methods pursuant to the appellee's consent. *See Richards,* 76 M.J. at 369.

Since keyword searches are insufficient, we next assess whether Special Agent M should have strictly limited his search to the timeframe of the appellee's relationship with LCpl JV. Even assuming, without deciding, that Special Agent M should have limited his search by time frame, the Cellebrite report was not organized in a manner that would allow Special Agent M to filter or manipulate the data.[51] Absent additional filtering functions, in a 33,000 plus page PDF document, Special Agent M had no mechanism of "fast forwarding" to the pertinent date range other than scrolling through the document in its entirety while skimming the corresponding message dates. The Cellebrite report was not indexed to indicate the beginning and end of each text message conversation, nor did it indicate the number of pages taken up by a given conversation. Special Agent M would have had no way to know how many pages or screens through which he would have to scroll until he would eventually reach the last text message, from which he could learn the date the conversation ended.

Having rejected keyword searches or a strict temporal limitation as sufficient search mechanisms, we assess whether Special Agent M's page-by-page review was reasonable. When Special Agent M first encountered the appellee's conversation with CM, he would have seen the header immediately followed by their text message conversation. While reading the first page, he could not know the date of their last text. Even if Special Agent M was focusing his review on the dates of the appellee's relationship with LCpl JV, he would still have to scroll through the exchange with CM to arrive at the later texts.[52] And by the time he scrolled to the end of the second page, he would have discovered that CM said she was fourteen years old and a ninth-grade student.

We decline to impose a limitation as to how fast Special Agent M had to scroll, or how much attention he was permitted to pay to the words on the screen as he would scan through thousands of pages of text in search of only certain dates.

Conducting an "ex post reasonableness" analysis, we find, in the context of this consent case, that Special Agent M's search method was reasonable. *Richards,* 76 M.J. at 370. Following our *de novo* review of the military judge's conclusions of law, we find that Special Agent M's search of the appellee's cell phone was conducted within the scope of consent given by the appellee in the

---

[51] As noted above, responsive evidence could pre-date the appellee's first contact with LCpl JV.

[52] In fact, SA BM testified he was "skimming" portions of the report. Record at 32.

first and second consent forms and that the search conducted was reasonable.[53]

Accordingly, we find that Special Agent M was searching in a permissible manner and in a permissible locale when he "arrive[ed] at the spot from which the incriminating materials [could] be plainly viewed." *Richards,* 76 M.J. at 371 (quoting *Horton v. California,* 496 U.S. 129, 136 (1990)). We find the "incriminating character" of the appellee's conversation with CM was "immediately apparent" once Special Agent M confirmed CM was actually a child, and Special Agent M had lawful access to search the Cellebrite report of the appellee's phone. *See id.* Once Special Agent M confirmed CM was a child, he ceased his consent-based search and sought and received a command authorization to search based on probable cause.

We find the military judge abused her discretion in suppressing the evidence at issue here. Accordingly, we will take appropriate action in our decretal paragraph.

### III. CONCLUSION

The appeal is granted, and the military judge's rulings in Appellate Exhibits XVII and XVIII are vacated. The record of trial is returned to the Judge Advocate General for transmittal to the convening authority.

Senior Judge HUTCHISON and Judge LAWRENCE concur.

FOR THE COURT

RODGER A. DREW, JR.
Clerk of Court

---

[53] What is reasonable in this case, in which the appellee consented to a wide-ranging search, may not be reasonable in another case, with a different search topic, different forensic report format, or in the context of a strictly-defined command authorization for search and seizure or search warrant.